COMMONWEALTH *vs.* JOSE GONZALEZ.

Middlesex. January 7, 2005. - April 1, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Admissions and confessions, Hearsay, Instructions to jury, Assistance of counsel. *Evidence,* Admissions and confessions, Relevancy and materiality, Joint enterprise. *Constitutional Law,* Admissions and confessions, Assistance of counsel. *Joint Enterprise. Malice. Witness,* Expert.

The judge at a murder trial did not err by admitting in evidence a witness's testimony that she watched the defendant's three alleged coventurers reenact the altercation that led to the victim's death, including the manner in which the defendant stabbed the victim, where in light of properly admitted grand jury testimony from a second witness that the defendant had been present during the reenactment and had participated in it, the testimony concerning the reenactment was admissible on the theory that the defendant's presence rendered it an adoptive admission by silence. [802-804]

At a murder trial, the judge did not err in admitting evidence of the defendant's prior bad acts, where the evidence was probative of the defendant's state of mind and was not unduly prejudicial. [804-805]

At the trial of an indictment charging murder in the first degree, the judge did not err in instructing the jury on joint venture and principal liability, where the Commonwealth had presented evidence that some principal existed other than the defendant, that the defendant shared the other's intent and was available to help if needed, and that the defendant did not abandon the joint enterprise [805-807]; further, the defendant failed to demonstrate that the judge's instruction on involuntary manslaughter incorrectly relieved the Commonwealth of any burden of proof [807-808].

A motion judge did not err in denying a criminal defendant's motion for a new trial, brought on the ground that his trial counsel had rendered ineffective assistance by calling a witness who gave damaging testimony and by failing to present certain expert testimony, where there was a reasonable strategic basis for calling the first witness, and where the expert testimony sought by the defendant was either already before the jury or entirely speculative. [808-811]

No reason appeared on the record of a murder trial for this court to exercise its power under G. L. c. 278, § 33E, to order a new trial or to direct entry of a lesser degree of guilt. [811-812]

INDICTMENT found and returned in the Superior Court Department on February 2, 1998.

The case was tried before *Sandra L. Hamlin,* J., and a motion for a new trial, filed on March 1, 2002, was heard by her.

*Greg T. Schubert* for the defendant.

*Michael L. Fabbri,* Assistant District Attorney, for the Commonwealth.

COWIN, J. A jury convicted the defendant of murder in the first degree on a theory of extreme atrocity or cruelty.[1] The defendant appeals from his conviction and from the trial judge's denial of his motion for a new trial. Represented by new counsel on appeal, the defendant argues error in the admission of certain evidence at trial and in certain of the judge's instructions. The ground for the defendant's appeal from the denial of his motion for a new trial is ineffective assistance of counsel. The defendant also requests that we exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or reduce his conviction. We affirm the conviction and the order denying the motion for a new trial and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* We summarize certain facts the jury permissibly could have found and leave additional specifics to the separate parts of the opinion to which the evidence relates. On November 24, 1997, at approximately 8:10 P.M., the victim, Carlos Vincente, also known as "Clash," was found by the police bleeding badly from stab wounds from which he ultimately died. Various people who lived in the vicinity of the beating described several Hispanic males as the assailants, and said that a shovel and a stick were used. Earlier that evening, the defendant had driven his girl friend, Melissa Pierce, and three of her friends, Desiree Alicia, Susie Rodriguez, and Ryan McGuinness[2] to a Framingham cinema for a job orientation.

---

[1]The defendant was also convicted of assault and battery by means of a dangerous weapon. This conviction was placed on file and is not before us. See *Commonwealth* v. *Qualls,* 440 Mass. 576, 577 n.1 (2003), citing *Commonwealth* v. *Delgado,* 367 Mass. 432, 438 (1975). Nevertheless, we note that because there was no evidence of an assault and battery independent of the incident that resulted in the victim's death, there was no basis for a separate verdict of assault and battery. This indictment should not have been submitted to the jury; once it was and a conviction resulted, it should have been set aside and the indictment dismissed. The defendant also was acquitted on an indictment charging intimidation of a witness.

[2]For ease of reference, we refer to all the individuals involved by their first names.

En route to the theater, the defendant saw the victim's bicycle and slashed its front tire. The defendant explained to the young women in his car that previously he had had an argument with the victim (about drugs and money) and that he would "get" him. After leaving the young women at the cinema, he proceeded in that endeavor. He picked up three of his cohorts, Abner Quinones, Efralin Quinones (Abner's brother), and Ezekiel Arroyo, and they hid in bushes waiting for the victim (now walking with his bicycle), essentially ambushed him, and administered a vicious beating. They hit the victim with their fists, a bat, a shovel, and an antitheft metal club device (club). The defendant also stabbed the victim several times. (The victim suffered eight stab wounds.) After this, the defendant returned to the cinema, picked up the four young women he had left there, and went to Melissa's house. En route, he described stabbing the victim and said that he "deserved it." Back at Melissa's house, he washed blood from his knife. He changed his T-shirt, although it had no visible blood, and Efralin changed his blood-stained jeans. The defendant instructed others to get rid of the victim's backpack and told everyone not to say anything about the evening's events.

Police investigation led to the arrest of the two Quinones brothers, Arroyo, and the defendant for the murder of the victim.[3] After his arrest, the defendant received and waived his Miranda warnings. He spoke to the police three different times. Although he originally denied any knowledge of the murder, in each successive conversation he provided increasing details of his involvement. Ultimately, he gave a version essentially as outlined above, but said that it was Ezekiel, not he, who had previously argued with the victim about money. He said that Ezekiel took his (the defendant's) knife from its sheath in his waistband and used it to stab the victim. He also said that when he realized that Ezekiel had stabbed the victim, he backed off, said, "I'm not with this . . . . I'm out of here," and ran back to the car to wait for the others.

The defendant said that he had not seen the knife since the incident and that he did not know the whereabouts of the knife's

---

[3]Ezekiel Arroyo, Efralin Quinones, and Abner Quinones pleaded guilty prior to the defendant's trial.

sheath. He also stated that he never saw a shovel during the fight, but later heard Abner bragging about hitting the victim with a shovel. He admitted telling the others that if the police asked what had happened they should say that they did not know anything and were not involved.

2. *Admission of reenactment.* The defendant claims that the judge erroneously admitted the testimony of Susie Rodriguez, that while the defendant was upstairs, she watched his three coventurers reenact the fight, including how the defendant stabbed the victim. The defendant maintains that Susie's testimony about the defendant's stabbing the victim was inadmissible hearsay and that this hearsay undermined the "key theory of the defense . . . that [the defendant] did not share intent to murder and was not the principal." As there was no objection to the testimony concerning the reenactment, we review to determine whether there was error, and if so, whether the jury's consideration of the hearsay created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Babbitt*, 430 Mass. 700, 708-709 (2000). There was no error. There was other evidence from the defendant's girl friend, Melissa Pierce, that the defendant was present during the reenactment and participated in it. If so, this testimony, if believed, rendered Susie's testimony concerning the reenactment admissible on the theory that the defendant's presence caused the reenactment to be admissible as an adoptive admission. *Id.*

Susie did not testify to anything the coventurers "said," but merely recounted what they "did."[4] Nevertheless, even if devoid of any oral statement by a coventurer,[5] the reenactment potentially presents hearsay problems. See P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence 496 (7th ed. 1999) ("Conduct of a party intended as an assertion is treated as a

[4]"They reenacted it. They showed us how one of them hit him with the bat or with the shovel . . . . The other one went behind him, got down on his knees, almost like if he can trip him, and Clash was a big guy, Clash couldn't fall that easily. So, they continued to beat him up. This is them showing us how they were beating him up and how Jose had stabbed him."

[5]It would appear that the reenactment here did involve words; otherwise, for example, the observer could not understand that one of the actors was portraying the defendant.

statement . . ."). That is, conduct can serve as a substitute for words, and to the extent it communicates a message, hearsay considerations apply. Thus, as the defendant argues, if the defendant were not present, Susie's testimony about the reenactment would be hearsay.[6] But if the defendant were present, the testimony is not inadmissible hearsay. Crediting the testimony of Melissa that the defendant was present has the effect of rendering what would have been inadmissable hearsay an adoptive admission of the defendant and thus admissible against him.

The defendant called Melissa Pierce, his girl friend, as a witness. Melissa, as we discuss in more detail in part 5, was hardly a model of consistency. She testified at the grand jury under oath and pursuant to a grant of immunity. Nevertheless, at trial, she contradicted much of her grand jury testimony. Her contradictions caused defense counsel to question her repeatedly by use of her grand jury testimony. There was no objection; there was no request that the foundational requirements be met, see *Commonwealth* v. *Clements*, 436 Mass. 190, 192-193 (2002); *Commonwealth* v. *Daye*, 393 Mass. 55, 73-75 (1984); neither side requested an instruction limiting Melissa's grand jury testimony to impeachment purposes; and no instruction was given. Thus, Melissa's grand jury testimony may be considered as substantive evidence.[7,8] See *Commonwealth* v. *Luce*, 399 Mass. 479, 482 (1987).

---

[6]Contrary to the Commonwealth's contention, the testimony would not have been admissible as a statement by a coventurer made during the pendency of a joint venture. It did not further a goal of the conspiracy. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 543 (1990), quoting *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976).

[7]Grand jury testimony is not admissible as substantive evidence unless certain requirements are met. See *Commonwealth* v. *Daye*, 393 Mass. 55, 73-75 (1984). See also *Commonwealth* v. *Clements*, 436 Mass. 190, 192-193 (2002). Here, the judge's instructions at the close of the trial informed the jury that "Grand Jury testimony . . . is before you for substantive purposes, just as if the witness was testifying before you . . . ." In the circumstances, this instruction was correct. No objection was made during trial to the admissibility of any grand jury testimony, and no request that the conditions be met was made; thus, any objection to its admissibility as substantive evidence was waived.

[8]As this testimony was presented by the defense, we do not reach the issue raised by *Crawford* v. *Washington*, 541 U.S. 36, 59 (2004) (testimonial state-

We now summarize Melissa's testimony concerning the reenactment and assess the effect of that testimony. Melissa stated that she told the grand jury that Jose was present during the reenactment: "Jose was pretending he was Clash while Ezekiel jumped on him, and then one of them took Clash's place and Jose pretended he was the one that was stabbing him." She also stated that when she was questioned before the grand jury about what Jose did with his hands, she "might have said nothing, to protect him, but I know now what he was doing." It was for the jury to credit any or all (or none) of Melissa's testimony. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 411 (1978), and cases cited. Thus, there was evidence that, if believed, would warrant the jury's finding that the defendant was present during the reenactment. The reenactment, therefore, even viewed as a communicative statement, is not barred by the hearsay rule. P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence, *supra.* See *Commonwealth* v. *Babbitt, supra* at 705-708 (adoptive admission by silence).

3. *Admission of evidence of assault and battery.* The defendant maintains that the judge should not have admitted testimony that, following the stabbing, the defendant pulled Melissa into the car, causing her to hit her head. He argues that this evidence lacked any probative value and was simply evidence of "bad character," and that evidence of prior bad acts may not be introduced to show the accused's propensity to commit the crime charged. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). The issue arose in the following manner. Several witnesses testified that at about 8:30 P.M., after the beating and stabbing of the victim, the defendant and his three friends returned to the cinema to pick up Melissa and her girl friends. The defendant screamed to the young women, "Get in the car," and seemed "in a rush," "hyper," and "angry." Melissa resisted getting in the car as there was inadequate space for everyone. The defendant pulled her in the car, causing her to hit her head on the door. The initial question thus turns on whether this evidence was relevant. Relevant evidence, if not unduly prejudicial, is admissible if admitted for a legitimate

ments inadmissible unless witness unavailable and there was prior opportunity for cross-examination).

purpose other than to demonstrate "bad character or criminal propensity." *Commonwealth* v. *Pagan*, 440 Mass. 84, 87 (2003), quoting *Commonwealth* v. *Fordham*, 417 Mass. 10, 22 (1994). The defendant did not object to the admission of this evidence. Again, we review to determine whether there was error and, if so, whether the error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Ashman*, 430 Mass. 736, 740-741 (2000). There was no error.

The defendant's acts regarding Melissa were relevant as probative of his haste, anxiety, and state of mind after the killing and his desire to proceed to a safe haven where he could rid himself of the incriminating evidence. In addition, he implicitly argues that even if this evidence were relevant, it should have been excluded because its prejudicial effect outweighs its probative value by impugning the defendant's character. These determinations are left to the sound discretion of the judge, see *Commonwealth* v. *Marrero*, 427 Mass. 65, 67-68 (1998), whose decision to admit such evidence will be upheld absent palpable error. See *Commonwealth* v. *Kater*, 432 Mass. 404, 415 (2000). The judge did not abuse her discretion.

4. *Judge's instructions.* a. *Joint venture.* The judge instructed on both joint venture and principal liability. The Commonwealth's evidence, as discussed above, indicated that the defendant was the principal. The defendant, while admitting to his participation in the beating, stated that Ezekiel took his knife and stabbed the victim and that he, the defendant, withdrew from the assault and did not share the intent to murder the victim. The defendant contends that the Commonwealth was not entitled to a joint venture instruction because it did not present evidence that there was a principal other than the defendant who committed the stabbing.

An instruction is proper if it is supported by any hypothesis based reasonably on the evidence. See *Commonwealth* v. *Thayer*, 418 Mass. 130, 132 (1994). Joint venture is established if the Commonwealth proves beyond a reasonable doubt (1) that the defendant was present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and

available to help the other if necessary.[9] *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). A joint venturer is "one who aids, commands, counsels, or encourages commission of a crime while sharing with the principal the mental state required for the crime." *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). "The elements of the [crime of murder] are not determined or influenced by whether the defendant was the sole perpetrator or only one of several participants in the crime[] [as long as] [t]he evidence was sufficient to show that the defendant was at least a participant, even if he was not the sole perpetrator, and that he possessed the state of mind required for guilt. Nothing further [is] required for conviction." *Commonwealth* v. *Dyer*, 389 Mass. 677, 683 (1983).

It is not necessary that the Commonwealth prove the identity of the other joint venturer or joint venturers, as long as the evidence supports the existence of some principal other than the defendant and that the defendant shared the other's intent and was available to help if needed. See *Commonwealth* v. *Silanskas*, 433 Mass. 678, 690 (2001) (defendant may be convicted of murder on joint venture theory without proof of identity of other joint venturer or joint venturers). Further, it is not necessary that the Commonwealth prove "the precise conduct of each [individual] if there [is] evidence that a [homicide] took place." *Commonwealth* v. *Bianco, supra* at 367. "Direct evidence of who shot the victim[] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] [killed]' the victim[]." *Commonwealth* v. *Chipman*, 418 Mass. 262, 268 (1994), quoting *Commonwealth* v. *Cohen*, 412 Mass. 375, 381 (1992).

The defendant's reliance on *Commonwealth* v. *Green*, 420 Mass. 771, 778-781 (1995), is misplaced. There was no evidence in the *Green* case that anyone other than the defendant performed the shooting or that the defendant was, by agreement, willing and able to assist this other principal in the

---

[9]A second theory of joint venture permits the defendant's conviction as a principal when he is not present at the scene "so long as the jury [find] [he] had actually associated [himself] with the criminal venture and assisted in making it a success." *Commonwealth* v. *Ortiz*, 424 Mass. 853, 858-859 (1997).

shooting. *Id.* at 779. See *Commonwealth* v. *Berry*, 431 Mass. 326, 332-333 (2000).

"The evidence was sufficient to warrant a finding that the defendant was guilty of murder committed with extreme atrocity or cruelty as a joint venturer." *Commonwealth* v. *Silanskas*, *supra* at 690. All the elements required for a joint venture were met here where there was a group effort to find and attack the victim and then conceal the crime. All four men were clearly present. As the defendant admitted to the police, the men sought the victim out with the intent to beat him severely as retribution for a previous fight involving a drug transaction. The defendant was, by agreement, available to assist the others in the beating: they all went to "get" the victim, they hid behind bushes waiting for him and eventually jumped on him, essentially ambushing him, and all four cooperated to beat, kick, and hit the victim with a shovel, the club, and a baseball bat. Witnesses saw the men trying to tackle the victim and hold him while one yelled in Spanish, "Hold him hard, hit him" — "hold him tight," "hit him hard." The evidence supported a finding that all the men shared the intent to act in such a way that "a reasonably prudent person would have known . . . according to common experience there was a plain and strong likelihood that death would follow." *Commonwealth* v. *Maynard*, 436 Mass. 558, 562 n.4 (2002), quoting *Commonwealth* v. *Semedo*, 422 Mass. 716, 720 (1996).

This brutal and vicious beating of an unarmed man by four men armed with a variety of weapons supported an inference that the men shared the requisite malice aforethought. Even if the jury believed the defendant's version that Ezekiel took his knife and stabbed the victim, there was sufficient evidence for the jury to determine that the defendant did not withdraw from the venture. The defendant admitted that he waited for the other men, drove them away from the scene and directed their efforts to get rid of the evidence. These facts warrant a finding that the defendant did not abandon the joint enterprise. *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 863-864 (2000).

b. *Involuntary manslaughter.* The defendant asserts that on the facts of this case "the Commonwealth's burden of proving malice included disproving the elements of involuntary

manslaughter" and that the instruction incorrectly "reliev[ed] the Commonwealth of its burden of disproving involuntary manslaughter beyond a reasonable doubt." Because Massachusetts has not defined manslaughter by statute, we derive its elements from the common law. *Commonwealth* v. *Godin*, 374 Mass. 120, 126 (1977). Involuntary manslaughter is "an unlawful homicide unintentionally caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." *Id.*, quoting *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 747 (1975). The Commonwealth has no burden to disprove involuntary manslaughter. *Commonwealth* v. *Dyous*, 436 Mass. 719, 734 (2002). The Commonwealth has the burden of disproving the elements of voluntary, not involuntary, manslaughter. See *Commonwealth* v. *McLaughlin*, 433 Mass. 558, 561 (2001) (Commonwealth must disprove "reasonable provocation" where raised by evidence). See generally *Commonwealth* v. *Garabedian*, 399 Mass. 304, 313 (1987). The evidence does not warrant, and no instruction was given, on voluntary manslaughter.

5. *Motion for a new trial.* The defendant maintains that the judge erred in denying his motion for a new trial on the ground of ineffective assistance of trial counsel. He claims that trial counsel was ineffective because he called Melissa Pierce as a witness when she gave damaging testimony and otherwise weakened his defense. He further claims counsel was ineffective because he did not present certain expert testimony. We consider each of these claims in turn.

Because the defendant has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Thus, we consider whether there was error during the course of the trial, and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* Under this more favorable standard of review, we consider a defendant's claim even if the action by

trial counsel does not constitute conduct "falling measurably below that . . . of an ordinary fallible lawyer." *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). The defendant's claim fails.

a. *Calling Melissa Pierce as a witness.* The defendant contends that the decision to call Melissa was ineffective because her testimony was adverse to his position that he could be convicted of involuntary manslaughter by bolstering the Commonwealth's case, and by causing the admission of evidence of a later assault on Melissa. If the record reveals sound tactical reasons for counsel's decisions, an ineffective assistance of counsel claim will not succeed. *Commonwealth* v. *Parker*, 420 Mass. 242, 248 n.7 (1995), quoting *Commonwealth* v. *Bousquet*, 407 Mass. 854, 863-864 (1990) (defense counsel's strategic reasons not ineffective assistance unless "manifestly unreasonable").[10] Here, there were such reasons. Melissa had given two statements to the police and testified before the grand jury. Her prior statements, in particular her grand jury testimony, provided reason to believe that she would be a helpful witness to the defense. Before the grand jury, Melissa testified that she did not see the defendant with a knife at any time after the stabbing, and that she never heard the defendant say Clash "deserved what he got," or "we stabbed Clash." She also stated that the defendant never asked her to tell the police a false story, but that two of the other young men did. She testified that she did not see blood on the defendant's hands or clothing. Although she did say that initially the defendant told her he had stabbed Clash once, she also said he later said that what "really happened" was that one of the others was "the one that did it" and that he (the defendant) had not done anything. She said that the defendant participated in a reenactment of the crime, but that the reenactment involved only jumping on the victim and "throwing punches," and that during the reenactment the defendant was not doing anything with his hands, "just standing there." Finally, she said that the defendant said that they

---

[10]It is significant that there is no affidavit from trial counsel to inform us of his strategic reasons for these decisions. See *Commonwealth* v. *Lynch*, 439 Mass. 532, 539 n.2 (2003).

were hitting Clash and he would not go down, that when they left him, he was still standing. In view of the evidence the Commonwealth had presented, this testimony would have benefited the defendant. Thus, the initial decision to call her could not be deemed ineffective assistance.

When called to testify, as we have described, Melissa gave a version of events significantly different from her prior testimony, forcing defense counsel to impeach her repeatedly with her grand jury testimony.[11] Nevertheless, as detailed above, Melissa's favorable grand jury testimony made counsel's decision to call her as a witness a reasonable one. That there was a reasonable strategic basis for calling Melissa ends our inquiry on this issue. See *Commonwealth* v. *Parker, supra* at 248 n.7.

b. *Expert testimony.* There was expert testimony that, two days after the murder, the defendant's hands and forearms tested positive for occult (nonvisible) blood. Several areas on the car the defendant was driving on the night of the murder also tested positive for the presence of occult blood. The defendant argues ineffective assistance because counsel did not call an expert to testify that many substances in addition to blood cause positive results for occult blood. There was no need to call such an expert; this information was already before the jury. Robin Baker, a chemist testifying for the Commonwealth, stated that substances such as rust, tomatoes, cauliflower, certain other vegetables, fecal material, and fertilizer will cause a positive reaction to the test for occult blood. Indeed, defense counsel on cross-examination elicited that testing for the presence of occult blood is only a "presumptive" test because occult blood is not visible and thus it cannot be said for a "fact that it is blood." Defense counsel also presented similar testimony from another chemist, as well as testimony that the presence of blood on the defendant's arms or hands could be explained by the fact that the defendant had a cut on his hand near his thumb.[12]

---

[11]It is clear from the transcript that counsel had not met with Melissa prior to trial. Despite the fact that the defendant possessed Melissa's grand jury testimony under oath, it would have been better practice to have interviewed her. Nevertheless, there is no basis for us to conclude that she would have been any more truthful in an interview than she was at any other stage of the proceedings.

[12]Visible blood stains were found on the driver's door handle of the defen-

The defendant further claims ineffective assistance because counsel did not call an expert to testify regarding whether the victim's stab wounds were caused by a right-handed assailant. This claim is entirely speculative. There is no evidence or affidavit indicating that an expert could make such a determination. See *Commonwealth* v. *Rice*, 441 Mass. 291, 303 (2004). Claims of ineffective assistance "must be shown by specific instances of attorney incompetence, not by mere speculation." *Commonwealth* v. *Thomas*, 399 Mass. 165, 169 (1987).[13]

6. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire transcript. It recounts a brutal and vicious ambush, beating, and stabbing of an unarmed man by four assailants. The defendant was the instigator of the incident. The motive for the beating and killing was a prior fight over drugs and money. There was powerful evidence of the defendant's guilt. Witnesses testified that immediately after the killing the defendant said that he had stabbed the victim; indeed two of them recalled the defendant saying that "he kept stabbing him because he didn't feel it go in the first time, so he kept stabbing him and stabbing him." The medical examiner's testimony that the victim had eight stab wounds was consistent with this statement. Witnesses also saw the defendant in possession of, and cleaning, a bloody knife immediately after the incident. He told the young women he drove to the Framingham cinema about a recent argument with the victim about drugs and money and recounted that the victim had left a "mark" on his face for which the defendant would "get" him back. The defendant admitted to disabling the victim's bicycle, organizing his three buddies, and with them staging an ambush in which the four men beat the victim with at least a bat and a metal club. There

dant's car and in the lock mechanism of the club found in the trunk of the car. Tests determined them to be the victim's blood.

[13]In the heading of his argument on ineffective assistance of counsel the defendant also claims that counsel was ineffective for arguing self-defense when the defendant and three other men ambushed the victim. He presents no argument to this effect. Nevertheless, pursuant to our obligation under G. L. c. 278, § 33E, we have reviewed the closing and there is no basis for such a contention.

is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to direct entry of a lesser degree of guilt.

*Judgment affirmed.*

*Order denying motion for a new trial affirmed.*