COMMONWEALTH vs. JAEAR WILLIAMS.

Plymouth. January 11, 2008. - February 13, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & BOTSFORD, JJ.

*Homicide. Joint Enterprise. Practice, Criminal,* Capital case, Admissions and confessions, Instructions to jury, Question by jury, New trial, Assistance of counsel. *Evidence,* Joint venturer, Statement of codefendant, Alibi, Admissions and confessions.

At a murder trial, no prejudice to the defendant arose from the judge's refusal to instruct the jury that the codefendant's postarrest statement to police and false alibi were not admissible against the defendant, where the postarrest statement was cumulative of other evidence admitted without objection, and where there was no likelihood that the jury would have found the Commonwealth's case against the defendant significantly less persuasive without considering the codefendant's false alibi. [649-650]

At a murder trial, an adequate foundation existed for the judge to admit a certain statement as an adoptive admission by the defendant, where the statement was the type that the defendant could be expected to deny if untrue, and where the defendant's response to it could be found not to constitute a denial. [650-651]

No substantial likelihood of a miscarriage of justice arose at a murder trial due to the testimony of a police officer regarding statements made by the defendant after his arrest, where the judge instructed the jury to disregard the objectionable testimony and stressed to the jury in his final charge that they were not permitted to rely on such information in reaching their factual conclusions. [651-652]

At a murder trial, at which the Commonwealth proceeded on a theory of joint venture, the judge did not err in denying the defendant's motion for a required finding, made at the close of the Commonwealth's evidence, where it was not necessary for the Commonwealth to prove the identity of the other joint venturers, as long as the evidence supported the existence of some principal other than the defendant and that the defendant shared the other's intent and was available to help if needed, and where the Commonwealth's evidence was sufficient to permit the jury reasonably to conclude that others were involved in the victim's shooting. [652-653]

At a murder trial, the judge did not abuse his discretion in answering a question from the jury or in defining the law of joint venture. [653-654]

The judge at a murder trial of codefendants did not abuse his discretion in denying one defendant's motion to set aside the verdict on the ground of mutually antagonistic defenses, where the codefendant did not seek to be acquitted by blaming the defendant, but rather suggested (as did the defendant) that someone else had committed the shooting. [654]

The defendant at a murder trial was not denied effective assistance of counsel when his counsel failed to obtain a copy of a certain television news broadcast, where the content of the broadcast was speculation, and where the defendant failed to show that the potential impeachment value of the evidence could have made a difference in the jury's conclusion. [654-656]
This court declined to exercise its authority under G. L. c. 278, § 33E, to reduce a verdict in a murder trial or to order a new trial. [656]

INDICTMENT found and returned in the Superior Court Department on February 22, 2000.

The case was tried before *Patrick F. Brady*, J., a motion to set aside the verdict was heard by him, and a motion for a new trial, filed on August 15, 2005, was also heard by him.

*Richard J. Shea* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. Based on a shooting that occurred in December, 1999, a jury convicted the defendant of murder in the first degree, as a joint venturer, on the theory of extreme atrocity or cruelty.[1] The defendant was tried with Demetrius Ennis, who was acquitted by the jury. The trial judge denied the defendant's motion to set aside the verdict. The defendant's motion for a new trial was also denied without an evidentiary hearing. The defendant is represented on appeal by counsel who had represented him in connection with his motion for a new trial. The defendant appeals from his conviction; from the denial of his motion to set aside the verdict; and from the denial of his motion for a new trial. The defendant also argues that we should exercise our power under G. L. c. 278, § 33E, to reduce the verdict to a lesser degree of guilt or to order a new trial. We affirm the defendant's conviction and the orders denying his motions to set aside the verdict and for a new trial. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

The jury could have found the following facts. Both the defendant and Ennis sold drugs, both on the street and, during December, 1999, from an apartment that was leased to another at 30 Walnut Park in the Roxbury section of Boston. Michael

---

[1]The Commonwealth had proceeded on theories of deliberate premeditation and extreme atrocity or cruelty.

Lee, the victim, who lived in Brockton, also sold drugs, and dealt in larger quantities than did the defendant and Ennis. The mother of one of the victim's children lived on Walnut Park. The victim and Ennis were friends. The victim associated with two individuals who lived in Philadelphia, Pennsylvania, namely, Michael Brown and Gregory Carter. Carter was the half-brother of Steven Knight.[2] Knight knew the victim as well as the defendant and Ennis. In December, 1999, Knight was incarcerated, and while he was incarcerated, his girl friend, Tamika Wilson, and her friend, Tanya Brimage, lived at Knight's apartment on Staniford Street in Boston. The defendant was a friend of Wilson, and would sometimes stay at the Staniford Street apartment.

The victim was last seen at about 10 P.M. on December 25, 1999, with the mother of one of his children outside her residence on Walnut Park. In her company, the victim spoke to someone on his cellular telephone and asked, "Is that you in the gray car?" There was a gray automobile within sight. The victim told the person on the telephone that he was just going to take his family upstairs and then would be right back down. The victim had been speaking with the defendant.

On the morning of December 26, 1999, the victim's automobile was towed from a wooded area adjacent to a parking lot of a school in Brockton. Two days later, on December 28, after the victim's sister reported the victim missing, his body was discovered in the trunk of his automobile at an automobile recovery yard. The victim's body had been wrapped with duct tape with a pillowcase placed over his head. The victim had been beaten, bound, and shot five times. He had been shot once in the jaw, once in the neck, twice in the chest, and once in the legs.

Investigation revealed that the pillowcase placed over the victim's head matched one recovered from the apartment at 30 Walnut Park, from which the defendant and Ennis sold drugs. Cellular telephone records indicated that between 1 A.M. and about 4 A.M. on December 26, the cellular telephone that the defendant possessed was used in Quincy, Braintree, Randolph, Avon, Brockton, and Holbrook. There was also ballistics evi-

---

[2]The defendant's trial counsel brought out, in the cross-examination of a witness, that Carter and Knight had been involved in selling drugs.

dence. Five .380 caliber automatic discharged cartridge casings
and one live .380 caliber automatic bullet were recovered in the
vicinity where the victim's automobile had been in the woods.
All of the discharged cartridge casings had been fired from the
same semiautomatic weapon. Two spent projectiles were recovered
from the victim's body, and a third spent projectile fragment was
recovered from the trunk of the victim's automobile. All three
projectiles were consistent with .380 caliber automatic ammuni-
tion and had been fired from the same weapon. No weapon was
recovered.

Early Christmas morning, the defendant, Carter, and another
man went to the Staniford Street apartment belonging to Knight.
A few hours later, Knight, from a house of correction, spoke
with Carter on the apartment's telephone. Later that day, at
about 7 P.M., Knight called the apartment again. The defendant
was present and spoke with Knight. The defendant indicated
that he was going to take care of a problem. Knight asked,
"Mike Lee [the victim]?" The defendant replied affirmatively.

At about 5 A.M. on December 26, Brimage let the defendant,
Ennis, Carter, and another man into the Staniford Street apart-
ment. Brimage went to sleep. She woke up after 8 A.M. to find
the defendant and Ennis present. Later, the defendant unzipped
a blue backpack and pulled out a gun and showed it to Ennis.
Ennis said, "Damn, you almost emptied the clip on that nigger."
The defendant laughed and said, "Shit."

At about 7 P.M. on December 26, the defendant visited his
friend Renee Phillips at her apartment. Referring to the victim,
the defendant told Phillips, "We had to take a ride with him last
night." He went on to say, "Well, I had to leave that nigger in
his trunk."

During the evening of December 28, at the Staniford Street
apartment, the defendant asked Brimage if she had heard that
the victim had been killed (Ennis was not present). Brimage
stated that she had not. The defendant told her that it was on the
news and that the victim had been killed in the woods. Brimage
turned on the news. While she was watching, Knight telephoned.
The defendant spoke with Knight, and during their conversation,
the defendant used the phrase "lights out." Afterward, Brimage
asked the defendant what the television report on the victim's

death meant by a "gruesome discovery" found in the trunk of an automobile. The defendant said that the victim had been shot in the head, the neck, and the face, and "everywhere." As the defendant headed out of the apartment, Brimage told the defendant that he needed to keep quiet. The defendant replied, "I don't care because if I go down, so don't a whole lot of other people." The defendant went on to say that he never should have brought Ennis with him.

The defendant attempted to evade police, but was arrested on January 2, 2000, in the Walnut Park area. He received Miranda warnings and told police that on Christmas Day, he had called the victim and had made arrangements to purchase one hundred dollars' worth of marijuana from the victim that evening. The defendant then headed on foot to 38 Walnut Park to see Wilson. While the defendant was heading into 38 Walnut Park, at approximately noon or 1 P.M., he ran into the victim, who was walking out of that building. The victim could not confirm that the drug deal would occur. The defendant made plans with the victim to meet on Walnut Park at about 10:30 P.M. that evening. The defendant then visited with Wilson for almost one hour. He later borrowed a motor vehicle and drove to Plymouth, visited Knight, and then returned to Boston. The defendant stated that he went to the Staniford Street apartment. He unsuccessfully tried to contact the victim. The defendant returned to Walnut Park at 10:30 P.M., but the victim did not appear. The defendant met up with Ennis. The defendant parted with Ennis and went to a club, where he stayed until 2 A.M. on December 26. The defendant returned to the Staniford Street apartment. The defendant said he learned of the victim's death from the news on either Monday, December 27, or Tuesday, December 28.

Neither the defendant nor Ennis testified, and they did not call any witnesses to testify on their behalf. The defendant's trial counsel suggested that it was Carter, not the defendant, who had killed the victim. He argued that Brimage and Phillips were not credible witnesses. He further pointed out that there was no forensic or ballistics evidence implicating the defendant and that there were inadequacies in the police investigation.

1. *Evidentiary issues.* a. After being arrested, Ennis gave a statement to police in which he stated that he had spent Christ-

mas night with his girl friend. In this statement, Ennis also stated that he had known the defendant for a long time and knew him to be involved in the drug business. Ennis's girl friend testified that Ennis had asked her to lie and tell the police that he had been with her the entire evening of Christmas. The defendant argues that the judge erred in refusing to instruct the jury that Ennis's postarrest statement to police and false alibi were not admissible against the defendant.

There was no prejudice to the defendant. See *Commonwealth v. Braley,* 449 Mass. 316, 326 (2007). As to Ennis's false alibi, there is no likelihood that the jury would have found the Commonwealth's case against the defendant significantly less persuasive without considering Ennis's statements. See *Commonwealth v. James,* 424 Mass. 770, 783 (1997); *Commonwealth v. LeBlanc,* 364 Mass. 1, 9-10 (1973). Ennis's efforts to exculpate himself did not corroborate any of the relevant evidence against the defendant. See *Commonwealth v. James, supra.* The fact that the jury acquitted Ennis indicates that they did not hold against him his efforts to falsify an alibi, and thus, such efforts could not reasonably be said to be significant evidence against the defendant. Ennis's statement that the defendant was involved in the drug business was of no real significance. The fact that the defendant, Ennis, and the victim all sold drugs was undisputed. Ennis's statement to police that the defendant was involved in the drug business was cumulative of other evidence admitted without objection. See *Commonwealth v. Braley, supra.*

b. During the testimony of Knight, a tape recording of a telephone conversation that took place on December 28, among Knight, the defendant, and Ennis, was played for the jury. The jury were permitted to read an informal transcript of the recording while they listened to the conversation. During the recording, Ennis stated to Knight that he and the defendant "were kicking his ass nigger." The judge admitted the statement, over the defendant's objection, as an adoptive admission.

We reject the defendant's contention that there was an inadequate foundation for the judge to admit the statement as an adoptive admission. Contrary to the defendant's suggestion, the judge did not state that the defendant silently assented to Ennis's statements, but found that the defendant said, "Yo, chill,

chill," to Ennis's statements. The defendant's remark indicated that he had heard the statement. We agree with the judge that Ennis's statement was the type of statement that the defendant could be expected to deny if untrue and that the defendant's response, "Yo, chill, chill," could be found not to constitute a denial. See *Commonwealth* v. *Sullivan*, 436 Mass. 799, 808-809 (2002); *Commonwealth* v. *Babbitt*, 430 Mass. 700, 708 (2000).

c. We reject the defendant's contention that a substantial likelihood of a miscarriage of justice arose due to the testimony of Sergeant Leonard Coppenrath of the State police regarding statements that the defendant made after his arrest. Specifically, the defendant (after receiving Miranda warnings) told Coppenrath that, on December 24, he had gone to an establishment or club and remained there until a shooting had occurred. Coppenrath added that the Boston police department "indicated that no such shooting took place." The judge sustained the defendant's objection and instructed the jury to disregard "what the Boston police reported." The defendant also told Coppenrath that, on December 25, he again went to the club and left there "about 2 P.M. [*sic*] [on December 26] at the time of the alleged shooting." At a sidebar conference, the defendant and counsel for Ennis objected. The judge instructed the jury as follows: "[D]uring the course of Sergeant Coppenrath's testimony, he interjected at one point that the shooting was at 2 A.M. [*sic*]. I'm going to ask you to disregard that." On redirect examination, Coppenrath stated, with no objection by the defendant's trial counsel, that the defendant had told him that, on December 26, he had left the club "[b]ecause of an alleged shooting that took place at 2 A.M. at [the club]." The defendant argues that these statements were prejudicial because they undermined his alibi by indicating that no shooting had occurred and had the effect of suggesting to the jury that his alibi was false. The defendant maintains that the prejudicial effect of the statements was not mitigated by the judge's instructions.

Jurors are presumed to follow a judge's instructions, including instructions to disregard certain testimony. See *Commonwealth* v. *Auclair*, 444 Mass. 348, 357-358 (2005), and cases cited. In addition to his two instructions made at the time of two

instances of the objectionable testimony, the judge stressed to the jury in his final charge that, whenever he told the jurors to disregard something, it was not evidence, and they were not permitted to rely on that information in reaching their factual conclusions. These instructions sufficiently eliminated any potential prejudice to the defendant on the first two interjections made by Coppenrath.

There was no error in Coppenrath's testimony on redirect examination because Coppenrath was simply pointing out that the defendant had stated that a shooting had occurred at 2 A.M. at the club. Apart from this testimony, there was evidence from which the jury could have reasonably inferred that the victim was killed anytime between 10 P.M. on December 25, when he was last seen with the mother of one of his children, and the morning of December 26, when his automobile was towed from the woods next to a school in Brockton. While the defendant told Coppenrath that, after 10:30 P.M. on December 25, he went to a club until 2 A.M. on December 26, and then returned to the Staniford Street apartment, telephone records indicated that he was traveling from Boston to Brockton from 1 A.M. to 4 A.M. on December 26, and Brimage testified that the defendant did not return to the Staniford Street apartment until 5 A.M. on December 26.

2. *Denial of the defendant's motion for a required finding.* The defendant's motion for a required finding was denied by the judge at the close of the Commonwealth's evidence. The defendant argues that there was insufficient evidence to convict the defendant as a joint venturer because, with Ennis's acquittal, there was no evidence that "a principal other than the defendant" was the person who shot the victim, *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995). We reject his argument.

"It is not necessary that the Commonwealth prove the identity of the other joint venturer or joint venturers, as long as the evidence supports the existence of some principal other than the defendant and that the defendant shared the other's intent and was available to help if needed." *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 806 (2005). Additionally, "it is not necessary that the Commonwealth prove 'the precise conduct of each [individual] if there [is] evidence that a [homicide] took place." *Id.*, quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 367,

*S.C.*, 390 Mass. 254 (1983). The Commonwealth's evidence was sufficient to permit the jury reasonably to conclude that others were involved in the victim's shooting. It could also be reasonably inferred by the jury that more than one person was needed to bind the victim and place him in the trunk of his automobile. Brimage testified that the defendant was accompanied by Carter, Ennis, and another man when she let them into the Staniford Street apartment at 5 A.M. on December 26. Carter and the other man left the apartment by 8 A.M. The defendant told Phillips that "we" had to take the victim for a ride on Christmas night, and that he had to leave the victim in his trunk. He told Brimage that if he went down, "so don't *a whole lot of other people*" (emphasis added). There was sufficient evidence supporting the defendant's culpability as a joint venturer.

3. *Jury instructions.* On the second day of their deliberations, the jury sent the judge a written note asking, "On the law of joint venture pertaining to this case, does it only refer to only the two defendants, Williams and Ennis?" The judge and the prosecutor considered the question confusing. The defendant's trial counsel and Ennis's trial counsel asked the judge to tell the jury to "confine" themselves to determining "was [the defendant] a joint venturer with [Ennis] or was [Ennis] a joint venturer with [the defendant]." The judge declined to give the instruction, stating that he did not understand the jury's question. Over the defendant's objection (and Ennis's), the judge sent the following written response to the jury: "Jurors: I am unable to answer your question because I do not understand it."

The judge anticipated that the jurors might clarify their question. Shortly thereafter, the judge received another written question from the jury, "Can one defendant be found guilty of joint venture and the other defendant found not guilty?" Without objection, the judge responded, "Yes."

The defendant argues that the judge's responses posed the risk that the defendant was convicted as a joint venturer, even if the Commonwealth had not proved that any other person was engaged in the joint venture or that any person had acted as a principal.[3] The defendant's argument is based on his view that the Com-

---

[3]The defendant does not argue that the judge erred in instructing the jury on the law of joint venture.

monwealth's evidence supported the culpability of only the defendant and Ennis as joint venturers. As we previously explained, the Commonwealth offered sufficient evidence suggesting that there may have been someone else (or others) involved in the joint venture apart from the defendant and Ennis. Proof of the precise identity of another joint venturer (or joint venturers) was not required. See *Commonwealth* v. *Gonzalez, supra.* Further, joinder of defendants at trial for the same crime does not require that all of the defendants be found guilty or none may be. See *Commonwealth* v. *Connearney,* 359 Mass. 200, 202-203 (1971). Viewing the evidence, in light of the instructions as a whole, the judge did not abuse his discretion in answering the jury's second question or in defining the law of joint venture. See *Commonwealth* v. *King,* 366 Mass. 6, 10 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts,* 419 U.S. 1115 (1975).

4. *Motion to set aside verdict.* The judge did not abuse his discretion in denying the defendant's motion to set aside the verdict on the ground of mutually antagonistic defenses. See *Commonwealth* v. *Diaz,* 448 Mass. 286, 290 (2007). Ennis did not seek to be acquitted by blaming the defendant. Rather, Ennis and the defendant shared common strategies, namely to suggest that someone else, likely Carter, committed the shooting, and to rely on the lack of forensic evidence implicating them in the shooting. Further, the videotape recording that showed the defendant entering the Staniford Street apartment building at 5 A.M. on December 26 was cumulative of Brimage's testimony. That Brimage could not positively identify Ennis on the videotape cannot be said to be exculpatory, antagonistic, and prejudicial in light of Brimage's testimony that there was a figure she could not make out on the recording, and that after letting this group into the apartment, she observed Ennis among them. The judge correctly concluded that the defenses were not "mutually antagonistic." See *id.*

5. *Motion for a new trial.* We reject the defendant's contention that he was denied effective assistance of trial counsel when his counsel failed to obtain a copy of a television news broadcast that Brimage watched on the evening of December 28, at the Staniford Street apartment with the defendant nearby or present. The defendant argues that the recording of the broadcast might

have provided material to impeach Brimage, who had testified that the defendant had given her more information about the location of the shooting than had appeared on the broadcast. Specifically, Brimage testified that the defendant said that the victim was killed in the woods, while the broadcast announced only that the victim's body was discovered in the trunk of an automobile.

In support of his motion for a new trial, the defendant submitted a one-page affidavit in which he states that the broadcast had been on "the Fox 25 early news," and that the reporter had been taken to the location where the victim's automobile had been discovered, namely, in the woods. The defendant also states that during Brimage's trial testimony, he informed his counsel of this information and requested that he should subpoena a tape recording of the broadcast. The defendant's trial counsel did nothing about the tape recording and, according to his affidavit, could not recall why. The defendant was granted post-trial discovery, but the television station responded that it did not have any records in existence pertaining to the discovery of the victim's body.

We review the defendant's ineffective assistance of trial counsel claim under G. L. c. 278, § 33E. See *Commonwealth* v. *Frank*, 433 Mass. 185, 187 (2001); *Commonwealth* v. *Parker*, 420 Mass. 242, 246 (1995). The absence of the tape recording of the broadcast at trial did not amount to error and, in any event, was not "likely to have influenced the jury's conclusion." *Commonwealth* v. *Frank*, *supra* at 188, quoting *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). The content of the broadcast was speculation. See *Commonwealth* v. *Bolduc*, 375 Mass. 530, 540 (1978). Further, the point of *potential* impeachment, concerning the location of the victim's automobile, would have been diminished by the absence of impeachment on the issue of the type, and extent, of the victim's injury. At trial, Brimage recounted that the defendant said that the victim had been shot "everywhere," including in the head, face, and neck, while the broadcast merely reported an unspecified "gruesome discovery." The medical examiner's testimony corroborated Brimage's testimony. The defendant's affidavit in support of his new trial motion was silent on any possible impeachment concerning

Brimage's testimony on the type and extent of the victim's injuries. The defendant has not shown that the potential impeachment evidence in the location of the victim's body could have made a difference in the jury's conclusion. See *Commonwealth v. Hudson*, 446 Mass. 709, 715 (2006).

6. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record under our statutory obligation and we decline the defendant's invitation to exercise our authority under G. L. c. 278, § 33E. The lack of forensic evidence, such as deoxyribonucleic acid retrieved from eyeglasses and boots found in the Walnut Park apartment used by the defendant and Ennis, linking the victim to the apartment, was argued to the jury during the defendant's closing remarks and was for them to consider. The jury's verdict was amply supported by other evidence offered by the Commonwealth, including the defendant's display of a firearm to Ennis on December 26 and his statement to Phillips the same day that he had to leave the victim in his trunk.

The defendant's trial counsel was able to argue, with respect to a fingerprint of a person named Gary Richards found on the trunk of the victim's automobile, that the Commonwealth's investigation was not adequate. That evidence did not exculpate the defendant and does not call into question the jury's verdict.

Finally, the Commonwealth's witness, Timothy Howard, did not exculpate the defendant. Reading Howard's testimony in full shows that he did not know from whom he allegedly purchased drugs on December 26, at 2 or 3 A.M., at the apartment on Walnut Park from which the defendant and Ennis sold drugs. He claimed it was either the defendant or Ennis.

7. *Conclusion.* The defendant's conviction is affirmed, as is the denial of his motion to set aside the verdict and the denial of his motion for a new trial.

*So ordered.*