COMMONWEALTH *vs.* ANTHONY P. CLEMENTE
(and fourteen companion cases[1]).

Suffolk. May 8, 2008. - September 5, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Self-Defense. Evidence,* Self-defense, Prior violent conduct, Reputation,
Relevancy and materiality, Exculpatory, Hearsay, Testimony before grand
jury, Previous testimony of unavailable witness, Joint enterprise, Conscious-
ness of guilt. *Practice, Criminal,* New trial, Loss of evidence by prosecu-
tion, Disclosure of evidence, Grand jury proceedings, Instructions to jury,
Venue, Voir dire, Assistance of counsel, Capital case. *Due Process of Law,*
Disclosure of evidence. *Grand Jury. Witness,* Unavailability. *Constitutional
Law,* Fair trial, Assistance of counsel. *Homicide. Jury and Jurors. Joint
Enterprise.*

In a murder case, a Superior Court judge properly exercised his discretion in
denying the defendants' motions for a new trial based on alleged errors
that affected the defendants' "first aggressor" claim, where the trial judge
allowed the defendants to present, without limitation, substantial evidence
of specific acts of violence on the part of the victims [303-307]; and where
the defendants were not harmed by the trial judge's instructions to the jury
requiring that the victims' specific acts of violence [307-308] and reputa-
tions for violence [308] be known to the defendants before the jury could
consider such evidence.

A Superior Court judge properly denied the criminal defendants' motion for a
new trial based on the loss of potentially exculpatory evidence, where the
defendants failed in their initial burden of establishing a reasonable pos-
sibility that access to the evidence would have benefited them. [308-310]

In a murder case, a Superior Court judge properly denied the criminal
defendants' motion for a new trial based on the Commonwealth's failure to
disclose exculpatory evidence (the report of an interview with a drug
dealer who allegedly sold drugs to one of the victims, and the grand jury
testimony of that drug dealer), where the report was not prepared by
anyone within the control of the prosecution, no evidence was presented
that drugs found at the crime scene were the same drugs that the drug
dealer had sold to one of the victims, and the report lacked any mention of
the incident in which the victims were shot [310-311]; and where the drug
dealer did not testify before the grand jury until months after the defendants'
trial had concluded [312].

At a murder trial, the judge did not err in denying the admission in evidence
against the Commonwealth of prior recorded testimony from a grand jury

---

[1]Seven against Anthony P. Clemente and seven against Damian A. Clemente.

proceeding of a witness who was unavailable at trial, where the defendant failed to establish that the Commonwealth had the opportunity and similar motive to develop fully the unavailable witness's testimony at the grand jury proceeding. [312-315]

At a murder trial, the judge properly excluded testimony that involved multiple hearsay, the desired inference from which was also totally speculative. [315-316]

The record in a murder trial was insufficient to determine whether the exclusion of certain testimony was error or, if so, what impact the error may have had. [316]

The judge at a murder trial properly excluded testimony regarding the content of a certain telephone conversation, offered to prove the state of mind of one of the defendants, where there was no evidence that the defendant in question knew about the telephone call [316-317]; moreover, there was no merit to the defendant's claim that he was not permitted to testify as to the content of other telephone calls [317].

At a murder trial, the judge's ruling denying the defendants access to the transcript of the pretrial hearing at which the judge concluded that a certain witness was required to testify before the grand jury did not deny the defendants the ability to cross-examine the witness, where the witness did not testify at trial, and where, even assuming that the defendants possessed a right to be part of the process in which a witness's claim of a privilege under the Fifth Amendment to the United States Constitution was considered, the defendants made no showing why such access would have helped them [317-319]; similarly, there was no merit to the defendants' argument that the judge improperly refused to allow them to review the transcript of a hearing at which the sole surviving victim of the incident claimed that he had a constitutional right not to testify at trial, where the attorneys for the defendants were present at the hearing [319].

At the trial of indictments charging the defendants with, inter alia, murder in the first degree, the judge's inaptly worded jury instruction on voluntary manslaughter did not amount to prejudicial error, where the evidence, viewed in the light most favorable to the defendant challenging the instruction, did not warrant a manslaughter instruction based on provocation [319-321]; further, no substantial likelihood of a miscarriage of justice arose from the judge's omission, from his instructions regarding excessive force in defense of another, of a specific statement that the use of such force required a manslaughter conviction, where, given that the judge immediately prior had instructed on self-defense and had included such a statement, it was clear that the principles applicable to self-defense applied equally to defense of another [321-323].

The judge at a criminal trial did not abuse his discretion in denying a motion for a change of venue based on improper influence on the venire, where the defendants neither established nor alleged pervasive bias in the community [323-324]; moreover, the defendants failed to show any impropriety either in the judge's refusal to interview already-seated jurors regarding alleged conversations among members of the venire who had not yet been selected, or in his excusing all potential jurors who expressed doubts about their ability to judge the case impartially [324-325].

At a murder trial, the judge did not abuse his discretion in not discharging a juror who had come in contact with, but had not read, a newspaper article

that was slipped under the door of the jury deliberating room, where, upon inquiry by the judge, the juror indicated that the incident had not in any way affected the juror's ability to be fair and impartial. [325-326]

At the trial of indictments charging the defendants with murder in the first degree, no substantial likelihood of a miscarriage of justice flowed from defense counsel's clearly tactical decision to waive a likely unsuccessful suppression motion concerning certain statements that one defendant made to a police sergeant, where, considering all the circumstances, the record demonstrated that the interview was not custodial in nature and that the defendant's will was not overborne in rendering the statements. [326-329]

At a murder trial, no ineffective assistance was evident from counsel's decision not to challenge a positive photographic identification of one of the defendants, where identification was not an issue at trial. [329]

At a criminal trial, the judge did not err in allowing certain statements one defendant made to police to be used substantively against the other defendant, where the second defendant did not request a limiting instruction as to the statements' use [329-330]; moreover, the failure to request such an instruction did not constitute ineffective assistance, as it appeared to have been the result of a strategic choice to support a claim of self-defense [330-331].

At a murder trial, the judge did not err in instructing on the intent element of joint venture, where his initial instruction set forth the precise statement that case law required, and where his elaboration on the intent requirement adequately set forth the Commonwealth's burden [331-333]; moreover, there was no merit to the claim that the judge improperly instructed that consciousness of guilt evidence could be used in determining whether the defendant had acted with malice [333-335].

This court perceived no reason to exercise its extraordinary powers to reduce a verdict of murder in the first degree or to order a new trial. [335]

INDICTMENTS found and returned in the Superior Court Department on December 8, 1995.

The cases were tried before *James D. McDaniel, Jr.,* J., and motions for a new trial, filed on May 30, 2003, and May 18, 2006, were heard by *Charles T. Spurlock,* J

*Robert L. Sheketoff* for Damian A. Clemente.

*Rosemary Curran Scapicchio* (*Adam Foss* with her) for Anthony P. Clemente.

*David D. McGowan,* Assistant District Attorney, for the Commonwealth.

COWIN, J. As the result of the shooting of five men in the 99 Restaurant in the Charlestown section of Boston on November 6, 1995, the defendant, Anthony P. Clemente (Anthony), was convicted in the Superior Court of four counts of murder in the first degree on the theory of deliberate premeditation. The

victims were Roman Luisi, Robert Luisi, Antonio "Anthony" Sarro, and Anthony "Sonny" Pelosi, Jr. Anthony was also convicted of armed assault with intent to murder and assault and battery with a dangerous weapon on a fifth man, Richard Sarro, who survived the shooting. In addition, Anthony was convicted of unlawful possession of a firearm and unlawful possession of ammunition. The codefendant, Damian A. Clemente (Damian), Anthony's son, was convicted of one count of murder in the first degree on the theory of deliberate premeditation[2] and two counts of murder in the second degree.[3] Damian was found not guilty on a fourth count of murder.[4] Damian was also convicted of armed assault with intent to kill and assault and battery by means of a dangerous weapon[5]; unlawful possession of a firearm; and unlawful possession of ammunition.[6] We have consolidated the defendants' appeals from their convictions and from the denials of their first and second motions for a new trial. See Mass. R. A. P. 19 (d) (2), as appearing in 430 Mass. 1606 (1999).[7]

On appeal, Anthony makes the following claims: (1) he was not permitted to present "first aggressor" evidence to corroborate his claim of self-defense, see Commonwealth v. Adjutant, 443 Mass. 649, 650 (2005) (Adjutant), and the judge did not instruct the jury properly on this issue; (2) his Federal and State rights to due process were violated because he was denied access to a "fanny pack" worn by one of the victims at the time of the shooting; (3) the judge erred in denying Anthony access to reports and grand jury testimony concerning one Alfred Sapochetti, an alleged drug dealer; (4) the judge improperly barred the admission of the grand jury testimony of an unavailable witness; (5) Anthony was denied a fair trial under the Sixth Amendment to the United States Constitution by the exclusion of certain

[2] The victim on this count was Robert Luisi.

[3] The victims on these counts were Anthony Pelosi and Antonio Sarro.

[4] The victim on this count was Roman Luisi.

[5] The victim in these two indictments was the surviving victim, Richard Sarro.

[6] A third defendant, Vincent Perez, was charged with similar crimes arising from the same incident. He was acquitted of most of the offenses and convicted only of unlawful possession of a firearm and ammunition. His convictions are not before us.

[7] The trial judge having retired, another Superior Court judge decided the first and second motions for a new trial.

testimony; (6) the judge erred in instructing the jury regarding provocation, see *Commonwealth* v. *Acevedo*, 427 Mass. 714 (1998), and whether excessive force would mitigate murder to manslaughter; (7) it was error to deny Anthony's motion for a change of venue; (8) the judge improperly retained a juror who saw a newspaper article that was slipped under the door of the jury deliberating room; and (9) Anthony was denied the effective assistance of counsel when his trial counsel waived a motion to suppress statements and failed to file a motion to suppress a photographic identification. Finally, Anthony requests that we exercise our extraordinary power under G. L. c. 278, § 33E, to grant him a new trial.

In his appeal, Damian contends that the judge erroneously permitted Anthony's statements to the police, made after Damian's arrest, to be used against Damian and that the prosecutor unfairly exploited that error; the judge erred by refusing to allow Damian to introduce the grand jury testimony of an unavailable witness[8]; and the judge incorrectly instructed the jury concerning joint venture, defense of another, consciousness of guilt, and the Commonwealth's burden on the issue of provocation, see *Commonwealth* v. *Acevedo, supra.*[9] Damian also joins Anthony's claims above numbered 1, 2, 3, 5, 7, and 8, as well as his request pursuant to G. L. c. 278, § 33E. We affirm the convictions and the orders denying the motions for a new trial, and we decline to exercise our power under G. L. c. 278, § 33E.

*Facts and background.* There is no challenge to the sufficiency of the evidence. We thus summarize the facts the jury could have found, reserving additional details for the discussion of the specific issues raised. For approximately one year prior to the shootings, Anthony was aware of problems between his son Damian and the Luisi family, and their associates, the Sarro family. The Luisis and the Sarros were following, harassing, and threatening Damian, apparently because Damian was sell-

---

[8]We consider Damian's claim of error regarding the exclusion of the grand jury testimony of an unavailable witness in our discussion of Anthony's claims. See note 27, *infra.*

[9]Damian's contentions concerning the instructions on defense of another and on provocation are considered in our discussion of Anthony's claims. See notes 39 and 50, *infra.*

ing drugs in the North End section of Boston and not being properly respectful, i.e., paying money to the Luisis.[10] Anthony discussed the problem with Robert Luisi three times during the year preceding the shootings; to the last of these meetings he brought a loaded nine millimeter handgun. Roman Luisi, Richard Sarro, and Anthony Sarro were also at that meeting, and when those three men "became aggressive" (the record does not describe any specific acts of aggression), Anthony reached "in [his] back" where his gun was hidden, but he did not pull out his gun. Robert Luisi did not assure Anthony that his son was safe; quite the contrary, Anthony was convinced that the Luisis were going to kill Damian. As a result, Anthony nailed the windows in his house shut, loaded a shotgun and placed it in his bedroom, and put his loaded nine millimeter handgun in his bed. He also bought a cellular telephone for Damian.

On November 5, 1995, Damian and Vincent Perez were in a fight with Robert Luisi's nephew, Joseph Ferlito, in a North End coffee shop. Ferlito was backed into a stairwell and was later seen bleeding from a head laceration.

The following day, November 6, Damian and Perez went to the 99 Restaurant. Sometime thereafter, Robert Luisi, Roman Luisi, Anthony Sarro, Richard Sarro, and Sonny Pelosi came in. Damian telephoned his father and, in a terrified voice, reported the presence of the other group. Anthony instructed his son not to move, took his nine millimeter gun, and went to the 99 Restaurant to "get the boys out of there alive."

As he approached the restaurant at approximately 1:25 P.M., Anthony looked inside and saw the Luisis and Sarros sitting at a booth and noted that nothing had happened. Anthony entered the restaurant, went to the Luisi-Sarro group, and asked Robert Luisi, "What's going on?" Robert Luisi replied, "It's your fucking kid." Anthony asked, "Why is it always my fucking kid? This kid is nothing to you." Roman Luisi jumped from the booth, and the look in his eyes changed. Anthony stuck out his left hand and backed up somewhat, saying to Roman Luisi, "It [doesn't] have to be this way." Anthony saw Damian and Perez walking toward the Luisi table and saw Roman Luisi put both his hands

---

[10]At this point, we do not pass on the admissibility of the testimony on the subject of Damian's selling drugs in the North End. See part 10, *infra.*

down toward the fanny pack he was wearing in front. Roman Luisi said something about no one getting out of there alive.[11,12] Anthony shoved his son and Perez behind him and shot Roman Luisi. Sonny Pelosi yelled and Robert Luisi stood up. Anthony shot Sonny Pelosi. Robert Luisi reached for Anthony, who shot him in the head. Anthony heard the sound of shots, and believed he was being shot, but was not certain of the source. He saw Roman Luisi lying on the ground and shot him twice more, once in the back and once in the head. Anthony then saw Anthony Sarro moving and shot him again.[13] Anthony went "to drop the hammer on [Richard Sarro]," but his gun was now empty.

Off-duty Everett police Officer Robert Hall was in plain clothes eating lunch at the 99 Restaurant that day with Officer Paul Durant, also of the Everett police. Hall was carrying a gun, and after hearing the gunfire, saw two men with dark jackets, identified later as Damian and Perez, running to the door. Hall gave chase. He heard three or four more shots behind, but continued to pursue the two men, yelling, "Police, stop." Both men stopped and were arrested. Damian was found with a .45-caliber pistol and Perez with a fully loaded .38-caliber gun. A bullet fired from Damian's gun was recovered from the body of Robert Luisi.

Anthony left the restaurant and discarded his sneakers, jacket, and gun in a plastic bag in a dumpster near North Station. The next morning, November 7, 1995, Anthony was at the Charlestown Division of the District Court Department to attend the arraignment of his son. Prior to the arraignment he was inter-

---

[11]Although Anthony's attorney stated at oral argument, "two other people . . . grabb[ed] steak knives," the record is at best ambiguous. Anthony testified only: "What caught my attention was the motion and the sound of Sonny Pelosi calling out to [Robert Luisi] as he got up on the table reaching for — they had the knives that you — the silverware that you eat with." There is no indication in the record that steak knives were on the table. Nevertheless, because our review is pursuant to G. L. c. 278, § 33E, assuming in the defendants' behalf that there were steak knives on the table and that Anthony saw the victims reach for them, our decision is not changed.

[12]The Commonwealth, in cross-examination of Anthony and in closing argument, suggested that Anthony had "contrived" Roman Luisi's move toward his fanny pack.

[13]Anthony testified, "Moved back towards Table 45. [Anthony] Sarro's moving. Shot him again." But Anthony never indicates when he first shot Anthony Sarro.

viewed by Boston police Sergeant Detective Daniel Keeler and claimed that he had acted in self-defense at the 99 Restaurant. When Keeler asked, "How could it be self-defense? They were unarmed," Anthony answered, "How were we supposed to know?" Following the arraignment, Anthony was arrested, received and waived the Miranda rights, and explained to the police that his family had been in fear of the Luisi family and that Damian had told Anthony that there were rumors that Robert Luisi was going to hurt either his son or a friend.

The central issue at trial was whether the defendants acted in self-defense and whether Anthony acted in defense of another. The defendants presented substantial evidence of specific acts of violence by the victims. Joseph Blazo, a friend of Damian, told Damian prior to the shootings about an incident in California in which Roman Luisi had killed two people by shooting them in the back. When Giacomo Cincotti, a North End resident, learned of Damian's problems with the Luisis, Cincotti informed Damian of an episode that occurred on August 23, 1995, when Robert Luisi, Roman Luisi, and others pistol whipped him (Cincotti) and stabbed him in the face. Robert Luisi had a gun while some of the others had knives. Another man, Kenneth McCracken, tried to break up the fight, but Roman Luisi put a gun to McCracken's head and said, "Don't even try it, Kenny." McCracken fled. When McCracken saw Cincotti after the beating, Cincotti had cuts all over his face, deep wounds, and blood "everywhere." Blazo testified that one evening in the summer of 1994 in the North End, he saw Robert Luisi pull Damian out of his car and yell at him. On the same evening, Anthony Sarro told Blazo that if Damian didn't "relax," he (Anthony Sarro) would "put a bullet in his [Damian's] head." Blazo related this remark to Damian. About one week prior to the shooting, Blazo also saw Anthony Sarro pull his car up to Damian in the North End and tell Damian, "If you get involved in this fight with Joe Ferlito [Robert Luisi's nephew], Roman [Luisi] will kill you."

The defendants also presented much evidence regarding the victims' reputations for violence. Boston police Officer Joseph MacDonald, called as a witness by Anthony, conducted investigations in the North End and spoke to hundreds of North End residents. As a result, he was aware that Robert Luisi, Richard

Sarro, and Roman Luisi had reputations for violence. Robert Luisi had a reputation for "threaten[ing] to stab people [and] assault[ing] people with knives." People in the North End described Robert Luisi as a "vicious person," one who would "use baseball bats to hurt people" and who "would use threats of arson." North End residents were frightened of the Luisis because of their reputation as "men of violence." Anthony Sarro was known as a "bully" who would "beat people." Richard Sarro was considered "an enforcer for his uncle," and would also "beat people." Roman Luisi was described by those in the North End as "a man that carried a gun and that would use a gun [to] hurt people."

Boston police Detective Mario Modica was also called as a witness by Anthony. Modica had spoken to North End residents about the Luisis and the Sarros. He was aware that Robert Luisi had a reputation for violence and was considered a bully. Both Richard and Anthony Sarro had a reputation for violence, specifically of assaulting and threatening people in the North End. Joseph Blazo, a North End resident, said that people in the area were petrified of Roman Luisi, Richard Sarro, and Anthony Sarro.[14]

*Discussion.* 1. *The* Adjutant *issue.* As can be seen from the above summary of the testimony, the judge permitted the defendants to introduce substantial evidence of specific acts of violence by the victims, and this evidence was admitted without limitation. The judge also permitted the defendants to introduce significant testimony regarding the victims' reputation for violence.

The defendants claim error in the following respects: the judge excluded some evidence of specific acts of violence by the victims; the judge instructed improperly with respect to specific acts of violence by restricting the jury's consideration to those acts that were "known to the defendant"; and the judge did not permit the defendants to use evidence of specific acts of violence to support their contention that the victims were the "first aggressors," and that the defendants consequently acted in self-defense, see *Adjutant, supra* at 656.

Although the defendants concede that the judge admitted

---

[14]There was no evidence concerning specific acts of violence by Anthony Pelosi or evidence of his reputation. The defendants, however, treat the victims as a group for these purposes and we have done the same.

evidence of the victims' bad reputations, they claim that they were not allowed to introduce evidence of the victims' specific acts of violence in support of their "first aggressor" claim and that the judge limited the use of specific acts of violence evidence to that which was "known to the defendant."

The judge who heard the motions for a new trial declined to order a new trial based on these grounds. We review the decision of a judge on a motion for a new trial for abuse of discretion. "[T]he judge's ruling will be affirmed unless 'no conscientious judge, acting intelligently, could honestly have taken the view expressed by [the judge].' " *Commonwealth* v. *Candelario*, 446 Mass. 847, 858 (2006), quoting *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004). Reversal for abuse of discretion is "extremely rare." *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 732 (2007), quoting *Commonwealth* v. *Johnson*, 13 Mass. App. Ct. 10, 19 (1982).

Our consideration of these claims is complicated by the fact that we recently have altered the law in regard to the admissibility of evidence of a victim's specific acts of violence. When this case was tried, the law in Massachusetts allowed a defendant who raised the issue of self-defense and who was aware of the victim's specific violent acts or reputation for violence to introduce evidence of such acts or reputation in support of the proposition that he (the defendant) had a reasonable apprehension for his safety. See *Commonwealth* v. *Fontes*, 396 Mass. 733, 735-736 (1986); *Commonwealth* v. *Dilone*, 385 Mass. 281, 285 (1982).[15] A defendant could not, however, introduce evidence of the victim's specific violent acts or reputation for violence if the defendant was unaware of the victim's violent propensity. See, e.g., *Commonwealth* v. *Graham*, 431 Mass. 282, 291, cert. denied, 531 U.S. 1020 (2000).

The *Adjutant* case changed our law by permitting the admission of specific acts of violence, regardless of whether they were known by the defendant. In *Adjutant*, *supra* at 664, we held that "where the identity of the first aggressor is in dispute

---

[15]The reason for this rule was that a defendant's knowledge of facts that rendered him fearful was relevant to the defendant's state of mind and the reasonableness of his actions in claiming to have acted in self-defense. See *Commonwealth* v. *Adjutant*, 443 Mass. 649, 654 (2005) (*Adjutant*).

and the victim has a history of violence," the judge has the discretion to admit "evidence of specific acts of prior violent conduct that the victim is reasonably alleged to have initiated, to support the defendant's claim of self-defense."

The defendants argue that we should apply the *Adjutant* rule retrospectively to this case and conclude that the judge improperly limited the use of evidence of specific acts of violence when he instructed that the jury could not consider such evidence unless those acts of violence were known to the defendants. We decline to apply the *Adjutant* rule retrospectively in this case. Unlike rules that are constitutionally mandated and must be applied retrospectively, see *Commonwealth* v. *Dwyer*, 448 Mass. 122, 124, 147 (2006), the *Adjutant* rule is a "new common-law rule of evidence" to be applied prospectively only. *Adjutant, supra* at 667. We made an exception to our normal practice of prospective application when we applied the *Adjutant* rule retrospectively to the defendant in *Adjutant*. This was a most unusual step, and we did so on the grounds that the identity of the first aggressor was paramount in her case, that she had argued the issue of the victim's prior violent attacks at trial as relevant to the first aggressor question, and that she had pressed the issue on appeal.[16] *Id.* at 666-667.

Here, unlike in *Adjutant* and in *Commonwealth* v. *Pring-Wilson, supra* at 718, the judge allowed the defendants to present substantial evidence of the specific acts of violence by the victims, and when this testimony was admitted during the trial, it was admitted without limitation. At the end of the trial, in his final instructions to the jury, the judge did state that the jury could consider only specific acts of violence by the victims known to the defendants. The defendants did not object to the judge's instruction limiting the jury's consideration of evidence of the specific acts of violence to only those acts known to the defendants. Indeed, such an instruction was requested by both defendants. Because the issue was not pressed at trial, we decline to apply the *Adjutant* rule retrospectively.

[16]Likewise, in *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 735-737 (2007), we applied the *Adjutant* rule retrospectively because Pring-Wilson's situation was virtually identical to that of the defendant in *Adjutant*. He had vigorously argued the issue at trial, but evidence of specific acts of violence by the victims was not admitted.

Because we also review pursuant to G. L. c. 278, § 33E, even were we to apply the *Adjutant* rule to this case, we would affirm the decision of the motion judge. As stated, abundant evidence of the victims' specific acts of violence was admitted. The defendants claim that, despite this evidence, they were not permitted to introduce evidence of "specific acts of first aggression," such as evidence from a California murder trial against Roman Luisi[17] and Boston police reports of assaults committed by the Luisi family. Contrary to the defendants' claims, evidence regarding the California murders was admitted. The Boston police reports were not admissible because they were hearsay.[18] Moreover, given the evidence of the specific acts of violence that was admitted, it is impossible to say that the judge did not permit the jury to hear about specific acts of violence by the victims. Certainly it was within his discretion to limit the admission of additional cumulative evidence on the subject. *Commonwealth* v. *Woodward*, 427 Mass. 659, 681 n.36 (1998).

At oral argument on appeal, Anthony's attorney argued repeatedly that, although this evidence was admitted, it was not admitted on the question of who was the "first aggressor." The defendants ascribe too much significance to the term "first aggressor." The fact that a victim may have been the first aggressor is relevant to a defendant's claim of self-defense. The key point is the use of the evidence of specific acts of violence for purposes of buttressing a claim of self-defense. Here, the defendants were able to place before the jury the fact that the Luisis and Sarros were dangerous, violent men, fully capable of attacking them. If it were the defendants' purpose to show that the killings came about because they responded to attacks initiated by the victims, the evidence that they offered in this regard was admitted without restriction.

The defendants have directed us to no place in the record, and we have found none, indicating that, when the evidence was introduced, the judge limited in any way the purpose for which the evidence was admitted. Moreover, the defendants in their closing arguments repeatedly referred to the acts of violence

---

[17]Apparently, Roman Luisi was acquitted in this California case.

[18]The *Adjutant* case did not alter the rule against the admission of hearsay evidence. The case merely permitted the admission of evidence that previously had been deemed irrelevant.

of the victims and related it to the defendants' fear of the victims because of their violent natures. The defendants connected the violence of the victims to the question of who reached first for a weapon several times, e.g., "Roman Luisi killed people in public. And everybody knew about it. And it's important because it impacts the state of mind of the defendants as to how they're going to react under the circumstances."

The defendants argue that, despite the admission of evidence of specific acts of violence on the part of the victims, the judge effectively limited use of that evidence in his instructions to the jury. The judge instructed that the jury could consider evidence of "recent specific attacks of violence that were committed by the victim and *which were known to the defendant*" (emphasis supplied).[19]

Our review of the record indicates that the defendants were not harmed by the inclusion of the requirement that the specific acts of violence by the Luisis and their associates be known to the defendants. All of the specific acts admitted in evidence were already known to both Damian and Anthony. Damian himself had been the target of some of these acts. Other violent acts, including Roman Luisi's shooting of two people in the back in California, had been reported directly to him.

Anthony was no less aware of specific acts of violence by the Luisis and their friends. His son had repeatedly told him that he was in fear of these people. Anthony obviously believed his son's fear was justified — he went to Robert Luisi three times within the year preceding the shootings in an attempt to persuade the Luisis to leave Damian alone. Anthony's own actions reflected his knowledge of the victims' violent tendencies. He brought a loaded weapon to his third meeting with Robert Luisi and, at the meeting, witnessed the "aggressi[on]" of Roman Luisi, Richard Sarro, and Anthony Sarro. The acts of these men were sufficient to cause Anthony to reach for his gun. Following the meeting, Anthony believed these men would kill his son, and his fear of them was so great that he nailed the windows in his house shut, put a loaded shotgun in his bedroom and a loaded handgun in his bed, and bought a cellular telephone for his son. In addition, after

---

[19]As discussed earlier, this was a correct statement of the law at the time this case was tried.

the killings, Anthony told Boston police Sergeant Detective Keeler that "Bobby Luisi was muscling in on people" and that "everybody in the North End knows what Luisi is up to by doing that."

The defendants raise similar arguments regarding evidence of the victims' reputations for violence.[20] They concede that abundant evidence concerning the victims' violent reputations was admitted. They claim, however, that evidence of the victims' reputations for violence was not admitted as "first aggressor" evidence and that the judge instructed improperly that the evidence could only be used if the defendants knew of that reputation.

The judge instructed in regard to the reputation evidence that the jury could consider whether the victim had a reputation as a "violent or quarrelsome person that was known to the defendant before the alleged incident." That instruction was and is a correct statement of the law. See *Commonwealth* v. *Fontes*, 396 Mass. 733, 735 (1986). The *Adjutant* case did not alter our rule as to reputation evidence. See *Adjutant, supra* at 664-665. Reputation evidence remains admissible only if known to the defendant. Accordingly, the motion judge properly denied the motion for a new trial on this issue.[21]

*2. Lack of access to fanny pack.* The defendants allege that their Federal and State rights to due process were violated because they were denied access to a fanny pack worn by the victim, Roman Luisi, at the time of the shooting. They contend that, because the pouch may have contained a weapon for which Anthony believed Roman was reaching, access to the fanny pack would have buttressed the self-defense claim. Although this issue was raised in the first motion for a new trial, the judge did not address it.

When the Boston police responded to the 99 Restaurant, no weapons were found on any of the victims, but a "leather pouch"

[20]The issue was raised at oral argument, but not in the voluminous brief filed by Anthony. Ordinarily, an argument not raised in the brief is waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Were this not a case with a conviction of murder in the first degree in which we are statutorily obligated to review the entire record regardless of the assignments of error, see G. L. c. 278, § 33E, we would treat it as waived.

[21]In fact, Anthony testified that he was aware of the reputations for violence of Roman Luisi, Antonio Sarro, and Richard Sarro. He was also told that Robert Luisi was "trouble."

or fanny pack was found under the body of Richard Sarro. The fanny pack contained a pocket knife, a small plastic razor, a cellular telephone, four sets of keys, a wallet, over $2,000 in cash, a battery, and two loose pills.[22] No witness recalled who recovered the fanny pack. The police believed it to be of "no evidentiary value" to the case and returned it at some point to Roman Luisi's wife. The receipt for the return of the fanny pack was not dated.

The loss of potentionally exculpatory evidence includes evidence that is no longer in the possession of the police because it has been returned to its owner. See *Commonwealth* v. *Maimoni,* 41 Mass. App. Ct. 321, 330 (1996). A defendant seeking relief from the loss, destruction, or mishandling of potentially exculpatory evidence "has the initial burden . . . to establish 'a "reasonable possibility, based on concrete evidence rather than a fertile imagination," that access to the [evidence] would have produced evidence favorable to his cause'. . . ." *Commonwealth* v. *Kee,* 449 Mass. 550, 554 (2007), quoting *Commonwealth* v. *Dinkins,* 440 Mass. 715, 717 (2004), and cases cited. That is, the defendant must establish a reasonable possibility that the lost or destroyed evidence was in fact exculpatory. *Commonwealth* v. *Kee, supra.* If he does so, a balancing test is applied in which the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant are weighed. *Commonwealth* v. *Willie,* 400 Mass. 427, 432 (1987). "Our cases have consistently required that, before the balancing test is undertaken, the defendant must meet his initial burden of showing a reasonable possibility that the lost evidence was exculpatory." *Commonwealth* v. *Kee, supra* at 554-555, and cases cited.

Here, the defendants have failed in their initial burden of presenting concrete evidence that access to the fanny pack would have benefited them; thus, we do not reach the balancing test. In his brief, Anthony argues that access to the fanny pack would have enabled him to test it for gunshot residue, and "the presence of such residue would have created a reasonable doubt

---

[22]The specific contents of the fanny pack were described differently by various police witnesses. The above list contains all items mentioned by the witnesses.

about the identity of the first aggressor" to corroborate Anthony's self-defense claim. A claim that the evidence "could have" or "would have" assisted the defense is speculative at best and is not the equivalent of "concrete evidence." *Commonwealth* v. *Dinkins, supra* at 718. To the extent the argument is that access to the fanny pack might have provided evidence that the pouch contained a weapon (as distinct from gunshot residue), the claim remains speculative and ignores the testimony of all the police witnesses that no gun was found in the fanny pack.[23]

3. *Withheld evidence.* The defendants claim that the Commonwealth withheld from discovery the following material concerning Alfred Sapochetti, a man who allegedly sold drugs to Roman Luisi immediately prior to the shootings: a State police report of an interview with Sapochetti; a United States Department of Justice Drug Enforcement Administration (DEA) report of that interview; and grand jury testimony of Sapochetti. The contention is that the drugs sold by Sapochetti to Roman Luisi were not found on Roman Luisi's body, but rather in the possession of Richard Sarro, the sole surviving shooting victim. On this basis, the defendants assert that they were deprived of the opportunity to argue that, if Richard Sarro were able to remove drugs from Roman Luisi's body, it "is just as plausible" that he might have been able to remove a gun from that body as well.

Prior to trial, both defendants filed a general motion for exculpatory evidence. They were provided no information about Sapochetti. Apparently, they later obtained copies of the above-mentioned reports and grand jury testimony.[24] This material indicates that, while the defendants' trial was proceeding, Sapochetti was cooperating with the Federal government on matters unrelated to the defendants' case, and he was interviewed by agents of the

[23]Anthony's brief states, without record citation, that "[t]here was testimony that Roman Luisi customarily wore that fanny pack to conceal a gun." When Anthony's attorney was asked at oral argument to submit a letter citing authority for this claim, see Mass. R. A. P. 16 (1), as amended, 386 Mass. 1247 (1982), the letter submitted referred only to documents from a California case involving Roman Luisi. Those documents were not in evidence at trial. Accordingly, there was no testimony that Roman Luisi customarily carried a weapon in his fanny pack.

[24]The record does not explain how the defendants came to receive the reports and testimony.

State police and the DEA on March 31, 1997. A report of that interview, dated April 28, 1997, was prepared by agents of the State police. A second report, a "verbatim recitation" of the State police report, was prepared by the DEA agents on the same date. The motion judge found that the "report"[25] contained references by Sapochetti to members of the Luisi family, but no mention of events at the 99 Restaurant on the day of the shootings. He concluded that the prosecution had no obligation to disclose the report. We agree.

Due process requires that "the government disclose to a criminal defendant favorable evidence in its possession that could materially aid the defense against the pending charges." *Commonwealth* v. *Daniels*, 445 Mass. 392, 401 (2005), quoting *Commonwealth* v. *Tucceri*, 412 Mass. 401, 404-405 (1992). This duty of disclosure extends, however, only to "information in the possession of the prosecutor and information in the possession of persons 'sufficiently subject to the prosecutor's control.' " *Commonwealth* v. *Beal*, 429 Mass. 530, 531 (1999), quoting *Commonwealth* v. *Martin*, 427 Mass. 816, 824 (1998). Those subject to the prosecutor's control and whose work product is included within the prosecutor's duty of disclosure are those persons acting, in some capacity, as agents of the government in the investigation and prosecution of the case. *Commonwealth* v. *Beal, supra.* Here, there was no showing, or even an allegation, that the agents of the State police or of the DEA who interviewed Sapochetti were involved in any respect in the investigation of the shootings. Contrast *Commonwealth* v. *Thomas*, 451 Mass. 451, 454-455 (2008); *Commonwealth* v. *Lykus*, 451 Mass. 310, 326-328 (2008). Thus, the material sought was not prepared by anyone within the control of the prosecution and there was no obligation on the part of the prosecutor to obtain or disclose the report. In addition, no evidence was presented either at trial or in connection with the motions for a new trial indicating that the drugs found on Richard Sarro were the same drugs that allegedly had been sold by Sapochetti to Roman Luisi, and as the judge found, there was no mention in the report of the incident at the 99 Restaurant.

---

[25]The motion judge referred to only one report of the interview. The difference is insignificant because, as stated, the DEA report is a "verbatim recitation" of the State police report of the Sapochetti interview.

Months after the defendants' trial had concluded, Sapochetti testified before a Federal grand jury in Boston and described selling cocaine to Roman Luisi at the 99 Restaurant in Charlestown within an hour of the shootings. Sapochetti left the restaurant minutes prior to the shootings. According to the motion judge, this was the extent of Sapochetti's grand jury testimony that "had any relevance" to the defendants' case, and we concur in his assessment. The short answer to the defendants' claim that they were deprived of access to this grand jury testimony is that the testimony did not exist at the time of the defendants' trial.

Even if we addressed the claim on its merits, the prosecutor had no duty to discover before trial the identity of Sapochetti or the details of his drug dealing at the 99 Restaurant. "A prosecutor has no duty to investigate every possible source of exculpatory information on behalf of the defendants and . . . his obligation to disclose exculpatory information is limited to that in the possession of the prosecutor or police." *Commonwealth* v. *Beal,* *supra* at 532, quoting *Commonwealth* v. *Campbell,* 378 Mass. 680, 702 (1979). The motion judge ruled properly on this issue.

4. *Exclusion of grand jury testimony of unavailable witness.* At trial, both the Commonwealth and Anthony sought to call as a witness Joseph Ferlito, a nephew of Robert Luisi. According to trial testimony, Ferlito engaged in a fight with Damian and Perez in a North End coffee shop the night before the shootings. Damian and Perez left Ferlito bleeding from a head laceration. Before the grand jury,[26] Ferlito said that he had recounted the beating to his friends and family, including his uncle, Robert Luisi; his cousin, Roman Luisi; and Richard Sarro. Robert Luisi told Ferlito to "let Roman handle it." Anthony wanted to introduce Ferlito's grand jury testimony to buttress his position that the defendants were in danger from the Luisis.

At trial, Ferlito again claimed his privilege not to testify, and after a voir dire attended by all parties, the trial judge ruled that Ferlito had a valid claim under the Fifth Amendment to the United States Constitution. Anthony moved that Ferlito's grand

---

[26]When called to testify before the grand jury, Joseph Ferlito invoked his privilege under the Fifth Amendment to the United States Constitution. The judge (who was also the trial judge) refused to permit Ferlito to exercise the privilege at that time.

jury testimony be admitted as prior recorded testimony. The judge denied the motion. Anthony asserts that this ruling excluding Ferlito's grand jury testimony denied them the right to "present a defense."[27]

The question is whether the grand jury testimony of a witness who later becomes unavailable may be used against the Commonwealth at trial, an issue we have never resolved.[28] Our rule in both civil and criminal cases is that the prior recorded testimony of a witness at a former *trial* may be admitted as an exception to the hearsay rule "where the prior testimony was given by a person, now unavailable, in a proceeding addressed to substantially the same issues as in the current proceeding, with reasonable opportunity and similar motivation on the prior occasion for cross-examination of the declarant by the party against whom the testimony is being offered." *Commonwealth* v. *Meech*, 380 Mass. 490, 494 (1980). See *Commonwealth* v. *Martinez*, 384 Mass. 377, 381 (1981) (elements necessary for admitting prior testimony include witness's unavailability; opportunity for cross-examination of witness at prior hearing by person against whom testimony is being offered; ability to reproduce accurately former testimony; and substantial identity of issues at both trials).

We decline to adopt a general rule that would allow the admission of prior recorded testimony from a grand jury proceeding of a now unavailable witness. Prior recorded testimony is admissible because it is viewed as a reliable communication on particular relevant issues. It is testimony roughly equivalent to the type of testimony a jury would have heard at trial were the witness available, and on which a jury, if they believe the testimony, can act. The party against whom the testimony is offered will have had a reasonable opportunity and similar motive to develop the testimony adequately, either by direct, cross-, or redirect examination. Cf. *United States* v. *Salerno*, 505 U.S. 317, 321 (1992) (Federal Rule of Evidence 804[b][1], which provides for former testimony exception to hearsay rule, requires that party

[27]Although Damian did not join in Anthony's argument on this issue, he presented argument on it in his own brief. See part 5.e, *infra*.

[28]A witness at trial who invokes properly the Fifth Amendment privilege against self-incrimination is unavailable for purposes of the prior recorded testimony exception to the hearsay rule. *Commonwealth* v. *Canon*, 373 Mass. 494, 499-500 (1977), cert. denied, 435 U.S. 933 (1978).

against whom testimony is offered had opportunity and similar motive to develop testimony).[29]

Grand jury testimony differs importantly from trial testimony with respect to these criteria because the witness is handled in a significantly different manner at the grand jury than he or she would be at trial. In an ordinary trial, a witness is presented by one side to advance its case and cross-examined by the other to discredit the testimony. See *United States* v. *Omar*, 104 F.3d 519, 523 (1997). Each side usually has reason to treat the trial as a "last chance" with the witness, *id.*, and thus to develop the testimony as fully as possible.

At the grand jury, the Commonwealth's objective is to present enough evidence to obtain an indictment, and not to develop its case as fully as possible. Often the Commonwealth does not expose the entire case to the grand jury because that, in effect, is providing discovery to the defendant.[30] In addition, the Commonwealth need not bolster the credibility of the witnesses, discredit them (indeed, there is no cross-examination), or present the myriad of detail that is offered at trial. Sometimes the grand jury is used to obtain a small amount of evidence from a witness or to preserve testimony from an adverse witness who may later change his or her testimony. The Commonwealth has no incentive to present its complete or best case. "[T]ime is always a limiting factor and . . . no particular advantage accrues to the Commonwealth in introducing cumulative and repetitive evidence

---

[29]Although the United States Supreme Court's opinion in *United States* v. *Salerno*, 505 U.S. 317, 322-325 (1992), strongly suggests that Federal Rule of Evidence 804(b)(1), which provides a former testimony exception to the hearsay rule, "could embrace grand jury testimony," *United States* v. *Omar*, 104 F.3d 519, 523 (1st Cir. 1997), the Court also stated that any testimony admitted under rule 804(b)(1) must satisfy the opportunity and "similar motive" requirements of the rule. These requirements are that the party against whom the testimony is offered had an opportunity and similar motive to develop the testimony. Fed. R. Evid. 804(b)(1). Several Federal cases decided after *Salerno* have not admitted grand jury testimony under rule 804(b)(1) because these requirements were deemed to be unsatisfied. See, e.g., *United States* v. *Omar*, *supra* at 523; *United States* v. *DiNapoli*, 8 F.3d 909, 914-915 (2d Cir. 1993). Cf. *United States* v. *Foster*, 128 F.3d 949, 955-956 (6th Cir. 1997) (because government had sufficient opportunity and similar motive to develop testimony at grand jury, testimony of witness was admissible at trial).

[30]A transcript of the grand jury testimony must be provided to the defendant. See *Commonwealth* v. *Stewart*, 365 Mass. 99, 105-106 (1974).

before a grand jury on a given issue." *Commonwealth* v. *Martinez, supra* at 385.

Moreover, even if the Commonwealth does possess a "similar motivation" to develop the testimony, it will sometimes lack a meaningful opportunity to do so. For instance, the Commonwealth may not yet possess the evidence with which to confront and contradict an adverse witness, evidence that may become available later by the time of trial. See, e.g., *United States* v. *Omar, supra* at 523 (no indication that government had any evidence available at grand jury stage to contradict witness, and thus government had no meaningful opportunity to cross-examine witness).

In short, by its very nature, the testimony provided to a grand jury is limited, and no attempt is made to corroborate or discredit the witness providing the testimony. Ordinarily, this testimony is inadequate to provide a jury with reliable ground upon which to base their deliberations, and thus cannot fulfil the requirements of the prior recorded testimony exception to the hearsay rule.

If, however, the party seeking the admission of the grand jury testimony can establish that the Commonwealth had an opportunity and similar motive to develop fully a (now unavailable) witness's testimony at the grand jury, that earlier testimony would be admissible. See *United States* v. *Salerno, supra* at 322, 325; *United States* v. *Omar, supra.* Thus, the defendant would bear the burden of demonstrating that the party against whom this testimony is now offered (the Commonwealth) had the opportunity and similar motive to credit or discredit the testimony, and therefore proceeded at the grand jury as if the witness were now on the stand. Although Anthony here argued repeatedly that Ferlito's grand jury testimony should have been admitted, he did not make the required showing. Indeed, "[i]t is likely to be very difficult for defendants offering grand jury testimony to satisfy the 'opportunity and similar motive' test." *United States* v. *Omar, supra.* There was no error.

5. *Exclusion of testimony.* The defendants claim that they were denied a fair trial under the Sixth Amendment to the United States Constitution[31] because the judge excluded testimony

---

[31]"In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." Sixth Amendment to the United States Constitution.

relevant to their defense of self-defense. The defendants maintain that the excluded evidence was necessary to help establish that Roman Luisi reached for his fanny pack (in which he was known to carry a weapon) and thus was the first aggressor. Initially, we observe that there was no evidence at trial that Roman Luisi was known to carry a weapon in his fanny pack. See note 23, *supra*. We consider the defendants' arguments regarding each excluded subject.

a. The defendants contend that a waitress at the 99 Restaurant should have been permitted to testify that Roman Luisi's wife told her (the waitress) that she had received a telephone call from her husband shortly before the shootings telling her not to come to the restaurant, and that Mrs. Luisi said that she knew before the shootings that "something was going to happen" at the restaurant that day. This testimony involved multiple hearsay; it was an out-of-court statement by the wife repeating what her husband had said. The statement was offered to prove that Roman Luisi expected violence that day at the restaurant. In addition, the fact that he expected violence is not probative of who the shooter was or who was the first aggressor. The inference sought to be drawn from the excluded testimony was also totally speculative because the reason for Roman Luisi's call telling his wife not to come to the restaurant was not stated.

b. The defendants claim that Anthony was prevented from testifying to the specific conversation he had with Robert Luisi at the last of the three meetings between Anthony and the Luisis. No offer of proof was made regarding the excluded testimony. Because we do not know the content of the conversations, the record is insufficient for us to measure whether the exclusion was error or, if so, what impact the error may have had. See *Commonwealth* v. *Woods*, 419 Mass. 366, 370-371 (1995).

c. The defendants maintain that Damien Perez, the brother of Vincent Perez (the third codefendant at trial), should have been permitted to testify to the content of a telephone conversation he received from Vincent on the day of the shootings. The offer of proof was that Vincent told Damien Perez that the Luisis were looking for him (Vincent) and Damian Clemente to kill them. The defendants claim on appeal that the conversation should have been admitted to prove the state of mind of Anthony. The

testimony was not admissible to establish Anthony's state of mind; there was no evidence that he knew about the telephone call.

d. The next claim is that, when Anthony testified that he received two telephone calls from his son Damian that caused him to go to the 99 Restaurant, he (Anthony) was not permitted to testify to the content of those calls. The defendants are mistaken in their claim. At first, the judge did exclude the content of the two telephone calls. An offer of proof demonstrated that the first call informed Anthony that the Luisis were at the restaurant and the second that Roman had "told them [Damian and Vincent] they're not getting out of there alive." As a result of the offer of proof, the judge changed his mind and said, "I'll allow it." Defense counsel asked Anthony the content of the second telephone call. Anthony responded that Damian had said, "They're here, all of them . . . Bobby, Roman, Anthony, Ricky, another guy . . . and Roman is now staring at me." Defense counsel next asked, "Did he tell you anything else?" and Anthony answered, "It's not what he said . . . . It's how he —" The judge interrupted and said, "No, no. Did he tell you anything else is the question to you, sir. Did he?" Anthony replied, "No. Oh, I'm sorry, sir. I didn't know you were waiting for me." The prosecutor then requested a sidebar conference and asked that the conversation be struck, but the judge refused to do so. When defense counsel resumed questioning, it was on a different subject. The judge thus not only allowed counsel to inquire of Anthony about the content of the two telephone calls; the judge himself put a question to the witness about the content of the calls.

e. The defendants maintain that they were unfairly denied review of the transcript of a pretrial hearing at which the judge ruled that a witness, Joseph Ferlito, did not have a valid Fifth Amendment claim. See part 4, *supra*. The hearing was attended by the prosecutor and by Ferlito's attorney. As a result of that ruling, Ferlito testified at the grand jury. It will be recalled that Ferlito, a cousin of one of the victims, told the grand jury that he was beaten by Damian and Perez the night before the shootings.[32] Ferlito reported the fact of the beating to the victims, who indicated that the problem would be taken care of the next

[32]There is no claim that the defendants were denied access to Ferlito's

day. During the trial, when Anthony sought to call Ferlito as a witness, Ferlito claimed a privilege pursuant to the Fifth Amendment, and the judge held that he had properly done so and did not have to testify.[33]

The defendants repeatedly sought access to the transcript of the pretrial hearing at which the judge ruled that Ferlito had to testify before the grand jury. The judge stated that there was nothing exculpatory therein and denied the defendants' motion. The defendants claim that they were denied the ability to cross-examine Ferlito. The short answer to their contention is that Ferlito did not testify, and accordingly, no right of cross-examination existed. The defendants argue also that they were unable to review or introduce the transcript of the hearing in which the judge ruled that Ferlito had to testify before the grand jury. The defendants have pointed us to no authority that grants the defense access to hearings relative to a witness's claim of such a privilege, and we have found none. A defendant has no right to be part of the process in which a witness's claim of a Fifth Amendment privilege is considered. The hearing is held for reasons totally independent of the proceeding against the defendant, and the privilege is that of the witness. See *Commonwealth* v. *Simpson*, 370 Mass. 119, 121 (1976).

Even if a defendant should be permitted access to a hearing regarding a witness's claim of a privilege when called to testify at a grand jury, the defendants have made no showing in this case why such access would have helped them. The defendants have the burden of establishing why the judge's ruling was in error, and they have not done so.[34] *Commonwealth* v. *Torres*, 437 Mass. 460, 469 (2002). Nor does the record indicate that

grand jury testimony. The defendants' argument relates only to the denial of access to the pretrial hearing at which Ferlito's claim of privilege was considered, or at least the record thereof.

[33]Ferlito did not waive his privilege against self-incrimination by testifying before the grand jury. Our law is that "if an ordinary witness, not a party to a cause, voluntarily testifies to a fact of an incriminating nature he waives his privilege as to subsequent questions seeking related facts." *Commonwealth* v. *King*, 436 Mass. 252, 258-259 (2002), quoting *Taylor* v. *Commonwealth*, 369 Mass. 183, 189 (1975). Ferlito's grand jury testimony could hardly be considered voluntary; he had sought to claim his privilege against self-incrimination and a judge had ruled that he had no such privilege.

[34]The defendants do not argue that Ferlito did not have a valid Fifth Amend-

they sought to have a sealed transcript provided for this court, cf. *Commonwealth* v. *Oliveira*, 431 Mass. 609, 617 (2000).[35] The defendants have not demonstrated that they were deprived of anything meaningful to their defense. There was no error.

f. Finally, the defendants raise a similar argument in regard to Richard Sarro, the sole surviving victim of the shootings. Sarro was summonsed by the Commonwealth, refused to testify, and was committed by the judge to the county jail for contempt of court. The defendants claim that the judge refused to allow them to review the transcript of the hearing at which Sarro claimed he had a Fifth Amendment right not to testify. Our review of the trial transcript indicates that the attorneys for the defendants were present at the hearing at which Sarro claimed the Fifth Amendment privilege.

6. *Jury instructions.* a. Anthony claims that the judge instructed erroneously on voluntary manslaughter. In defining the crime of manslaughter, the judge stated that one of the "elements" the Commonwealth must prove beyond a reasonable doubt was that the defendant killed the victim "in the heat of passion." This instruction, as the Commonwealth concedes, was incorrect. See *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998).[36] "The correct rule is that, where the evidence raises the possibility that the defendant may have acted on reasonable provocation, the Commonwealth must prove, and the jury must find, beyond a reasonable doubt that the defendant did not act on reasonable provocation." *Id.* In this case, the instruction given was erroneous. The defendants objected to the instruction at trial; thus, we review to determine whether this error was prejudicial. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).[37]

The error was not prejudicial here, as the evidence, viewed in the light most favorable to Anthony, *Commonwealth* v. *Groome*, 435 Mass. 201, 220 (2001), did not warrant a manslaughter

ment claim or that there was any impropriety in ruling that he had such a privilege.

[35]We have attempted to obtain such a transcript, but have been unable, at the time of writing, to locate one.

[36]The trial here took place more than one year before our decision in *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998).

[37]Although Damian did not join in this issue as presented in Anthony's brief, Damian argued the same issue in his brief.

instruction based on provocation. See *Commonwealth* v. *Brooks*, 422 Mass. 574, 578 (1996) ("If any view of the evidence . . . would permit a verdict of manslaughter rather than murder, a manslaughter charge should be given").

One of the mitigating circumstances that renders the crime a voluntary "manslaughter . . . [is] a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat." *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980), quoting *Commonwealth* v. *Soaris*, 275 Mass. 291, 299 (1931). "There must be evidence that would warrant a reasonable doubt that something happened [i.e., provocation] which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth* v. *Walden*, *supra* at 728. Guidance as to what constitutes sudden combat and heat of blood is found in Chief Justice Lemuel Shaw's classic description of those terms in *Commonwealth* v. *Webster*, 5 Cush. 295, 308 (1850): "When two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant, it is a mutual combat. And if no unfair advantage is taken in the outset, and the occasion is not sought for the purpose of gratifying malice, and one seizes a weapon and strikes a deadly blow, it is regarded as homicide in heat of blood . . . ." See *Commonwealth* v. *Gaouette*, 66 Mass. App. Ct. 633, 640-641 (2006).

We have applied Chief Justice Shaw's concept in a variety of cases. See, e.g., *Commonwealth* v. *Berry*, 431 Mass 326, 335 (2000) (adequate evidence of provocation where victim charged defendant, swung at him, and hit him with beer bottle); *Commonwealth* v. *Acevedo*, 446 Mass. 435, 443-444 (2006) (adequate evidence of provocation where defendant testified to being surrounded by victim and his associates, punched repeatedly in head, and knocked to ground, causing him to fear for his life). Moreover, we have held that mere words are insufficient to produce the requisite state of passion in a reasonable person, and are thus inadequate as evidence of provocation. See *Commonwealth*

v. *Callahan*, 401 Mass. 627, 632 (1988). Even physical confrontation initiated by the victim may not be sufficient. See, e.g., *Commonwealth* v. *Walden*, *supra* at 727.

In these and other cases in which a provocation instruction has been warranted, the combat was unplanned and the defendant was often the one subject to the first physical attacks that escalated into mutual violence. See, e.g., *Commonwealth* v. *Berry*, *supra.* Here, however, according to Anthony's testimony, which we credit for determining whether a manslaughter instruction was warranted, see *Commonwealth* v. *Groome*, *supra*, Anthony armed himself in preparation for a fatal confrontation and, carrying a loaded deadly weapon, went to a location where he knew he would find the victims. Although Anthony may have feared the victims, he sought them out. Upon arriving at the restaurant, he looked inside and saw that nothing untoward had occurred. He then approached the table where the victims were seated and asked, "What's going on?" Robert Luisi replied, "It's your fucking kid." Anthony responded, "It's always my fucking kid? This kid is nothing to you." Roman Luisi jumped up; Anthony said, "It [doesn't] have to be this way," saw Damian and Perez coming down the aisle, and saw Roman Luisi's eyes change and both of his hands go toward his fanny pack. Roman Luisi said something about no one getting out of there alive. Anthony pushed the two younger men behind him and "[r]eached, cocked and fired." He eventually shot four men dead and wounded a fifth. He never saw any of the victims with a gun. The facts that Anthony believed his son might be in danger and that Roman Luisi reached for his fanny pack, see note 23, *supra*, were not sufficient to constitute provocation.

Because Anthony was not entitled to an instruction on provocation, he received more protection than the law afforded him; therefore, the error could not have prejudiced him. See *Commonwealth* v. *Flebotte*, *supra* at 353.[38]

b. Anthony maintains also that the judge provided inadequate instructions regarding the issue of excessive force in defense of

---

[38]Because the evidence did not support an instruction on provocation for the principal, Anthony, the joint venturer, Damian, cannot benefit from a provocation instruction. *Commonwealth* v. *Pasteur*, 66 Mass. App. Ct. 812, 819 (2006).

another.[39] He argues that the judge made that defense "an all or nothing proposition" by use of the following language: "A person may not use excessive force when intervening on behalf of another person. The actor's justification is lost if he uses excessive force." There was no objection; we review to determine whether there was a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Niemic*, 427 Mass. 718, 720 (1998). Anthony argues that the judge failed to inform the jury that use of excessive force in defense of another required a manslaughter conviction and precluded a conviction of murder.

This contention, however, disregards the judge's instructions that immediately preceded the above-quoted sentences. The judge had in fact instructed for several transcript pages regarding the law of self-defense and, in that connection, explained that excessive use of force in self-defense required a manslaughter conviction. After that, the judge proceeded to instruct on defense of another. It was clear in context that the instructions on self-defense, including the instruction on excessive force in self-defense, applied equally to the subject of defense of another.

Anthony seeks support from *Commonwealth* v. *Johnson*, 412 Mass. 368, 370-374 (1992). He argues that the judge's instruction there ("The actor's justification is lost if he uses excessive force . . .") was identical to that used in the present case, and resulted in a reversal. In *Johnson*, however, errors permeated the entire portion of the instructions on self-defense and defense of another. The judge instructed improperly on the entire concept of self-defense without regard to whether the theory applied solely to the defendant or to the defense of another. First, he erroneously stated that a finding of self-defense would entitle the defendant only to a reduction of the verdict from murder to manslaughter, whereas the law is clear that such a finding entitles the defendant to an acquittal. He erred as well by failing to explain that where there is a finding of self-defense and a finding of excessive force, the required verdict is manslaughter. *Id.*

Thus, our decision in *Johnson* was directed to a range of

---

[39]Damian argues separately regarding the instruction on excessive force in defense of another. Our discussion here applies to the contentions of both defendants.

basic self-defense issues that were handled properly in the case before us. Here, the judge's only failure, if it were one, was the omission of a specific statement that the principles applicable to defense of oneself apply equally to defense of another. Given that the judge's general instruction on self-defense, which immediately preceded the instruction on defense of another, contained an explicit statement that the use of excessive force in self-defense requires a verdict of manslaughter, there was little chance that the jury misunderstood.

7. *Change of venue.* The defendants claim that the trial judge abused his discretion in denying a motion for a change of venue, and in declining to conduct a voir dire of jurors already selected, when it became apparent that some members of the jury pool might have been discussing the case among themselves. During empanelment, after three jurors had been selected, a member of the venire, juror no. 6-6, told the judge that a second member of the venire, juror no. 10-16, had talked about the case, that he "[knew] quite a bit" about it, and that he had told her that the defendants were guilty. Juror no. 6-6 said that she did not see juror no. 10-16 talking to anyone else, but that she herself had discussed the conversation with a third member of the venire. The judge excused juror no. 6-6 and spoke with juror no. 10-16, who denied any such conversation. Juror no. 10-16 was returned to the jury room, and ultimately was excused for this reason.

All remaining members of the venire (other than the three jurors who had already been selected) were asked during individual voir dire if they had had, or overheard, any conversations about the case among other members of the venire. Two who answered affirmatively were excused.[40] Anthony also asked the judge to interview again the three jurors who had already been seated when juror no. 6-6 reported the conversation. The judge declined to do so.[41] Anthony and Damian moved for a change of venue and to strike the panel. On appeal, the defendants claim that "the court abused its discretion in failing to grant the

[40]Later, on the third day of jury selection, another juror was excused after reporting that he had heard an unknown person stating "a strong opinion about [the case]" at a restaurant during the lunch recess.

[41]It is unclear whether Anthony objected; nonetheless, we will treat the issue as preserved.

defendant[s'] motion for a change of venue because the judge did not voir dire already selected jurors" to determine whether they had been affected by the discussions among members of the venire.

Although at trial the defendants moved both for a change of venue and to strike the venire, on appeal they frame the issue only as a challenge to the judge's denial of the motion for a change of venue. Giving the defendants the benefit of the doubt, we consider that they raised two propositions that the trial judge rejected: change of venue and striking the venire. A change of venue is not a remedy for an improperly influenced venire. A change of venue is granted when it is impossible to obtain a fair and impartial jury due to pervasive bias in the community. See, e.g., *Commonwealth* v. *Morales*, 440 Mass 536, 538-540 (2003); *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 551 (1990); Mass. R. Crim. P. 37 (b), 378 Mass. 914 (1979). The defendants do not allege, much less establish, that such bias was present in this case.

We turn, then, to the question whether there was improper influence on the venire or any error in the judge's handling of the issue. There was no error. We afford trial judges "a large degree of discretion" in the jury selection process. *Commonwealth* v. *Vann Long*, 419 Mass. 798, 803 (1995). So long as a judge explores the grounds of any possible claim that a juror may not stand indifferent, and does so in a fair and neutral manner, we will not conclude that the judge abused his discretion by seating the juror "unless juror prejudice is manifest." *Commonwealth* v. *Seabrooks*, 433 Mass. 439, 443 (2001).

The defendants have not shown that the judge abused his discretion by refusing to interview again those jurors who had already been selected. The defendants have produced nothing that supports their speculation that those jurors who had already been seated (and who had been removed to a different room when they were empanelled) were aware of the allegedly prejudicial conversations, much less that their impartiality had been affected. The venire had been asked collectively whether there was any reason any person might not stand indifferent. Had any member of the venire been aware of, or affected by, juror no. 10-16's bias, there was ample opportunity so to inform the judge. The judge received

declarations of impartiality from those jurors who were seated, and a judge is entitled to accept such assurances of disinterest. *Commonwealth* v. *Colon-Cruz, supra.*

With regard to the possible influence of improper conversations among the members of the venire who had not yet been selected, the judge conducted a proper inquiry. Of the potential jurors alleged to have participated in or overheard the conversations, none was seated. The judge conducted a thorough inquiry of each potential juror and excused all those who expressed doubts about their ability to judge the case impartially. See *Commonwealth* v. *James*, 424 Mass. 770, 777 (1997). The judge's response was sufficient.

8. *Extraneous influence on jurors.* On the third day of deliberations, a newspaper article about the case was slipped under the door of the jury room, apparently while a court officer had left her post momentarily. A juror saw the paper come under the door and immediately picked it up and showed it to the foreman, who gave it to the court officer. When the judge learned of the incident, he called in the foreman and the juror who had first seen the paper and interviewed them separately; both stated that they did not read the article, and that while other jurors had seen the paper, no one else had read it. The judge then called in the entire jury and asked them whether the incident had in any way affected their ability to be fair and impartial. All responded in the negative, and the judge instructed the jury to resume deliberations. The next day, the defendants moved for a mistrial. The judge denied the motion. The defendants claim that the two jurors who came into contact with the article were "tainted by contact with extraneous influence," and that it was an abuse of discretion not to have discharged one of them.[42]

The discharge of a deliberating juror is not a matter to be taken lightly. See *Commonwealth* v. *Connor*, 392 Mass. 838, 843 (1984) (discharge of deliberating juror is "fraught with potential for error"). In addition, we have granted trial judges "wide discretion" in dealing with publicity that might have a prejudicial effect on jurors. *Commonwealth* v. *Jackson*, 376 Mass. 790, 799 (1978). The judge in this case followed the procedures set forth in *Com-*

---

[42]The brief does not specify which juror should have been dismissed.

monwealth v. *Jackson, supra.* Having established that two jurors might have come into contact with the material, he questioned those jurors individually, out of the presence of other jurors, to determine the extent of their exposure to the material and whether it affected their ability to render an impartial verdict. See *id.* at 800. He also satisfied himself that the remaining jurors, whom he questioned en masse, had not been exposed to the extraneous material and that the fact of the incident itself had not affected them. See *id.* The judge was entitled to believe the jurors when they stated that their impartiality would not be affected. *Commonwealth* v. *Gregory,* 401 Mass. 437, 444 (1988). See *Commonwealth* v. *Francis,* 432 Mass. 353, 369 (2000) (judge is best able to observe juror's demeanor, and "[w]e will not disturb this assessment on appeal").

9. *Ineffective assistance of counsel.* Before trial, Anthony moved to suppress the statements he had made to Sergeant Detective Keeler in interviews at the Charlestown Division of the District Court Department. During the hearing on the motion to suppress, Anthony's counsel waived the motion. Anthony now claims that his counsel was ineffective for waiving the motion. Anthony also alleges ineffective assistance of counsel from counsel's failure to move to suppress an identification made from a photographic array. One of the witnesses to the shootings, Mark Santosuosso, chose Anthony's picture from a photographic array on the day after the murders and positively identified him as the shooter. Anthony now claims that the array was impermissibly suggestive.

Because this is a capital case, we examine Anthony's claim of ineffective assistance to determine "whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining ineffectiveness of counsel." *Commonwealth* v. *Gonzalez,* 443 Mass. 799, 808 (2005). We consider Anthony's claim even if trial counsel's actions do not constitute conduct "falling measurably below that . . . of an ordinary fallible lawyer." *Id.* at 808-809, quoting *Commonwealth* v. *MacKenzie,* 413 Mass. 498, 517 (1992). Even under this more generous standard, Anthony's claims fail.

We give deference to trial counsel's tactical decisions, finding

ineffectiveness only if "those decisions were 'manifestly unreasonable when made.' " *Commonwealth* v. *Mathews*, 450 Mass. 858, 866 (2008), quoting *Commonwealth* v. *Coonan*, 428 Mass. 823, 827 (1999). Unless the record reveals "manifestly unreasonable" grounds for these decisions, a defendant's claim will not succeed. *Commonwealth* v. *Gonzalez*, *supra* at 809. Here, trial counsel's decisions, both to waive the suppression motion and not to seek to suppress the identification, were clearly tactical in nature, made in the interests of presenting a coherent defense. Anthony's defense at trial was self-defense and defense of another. His statements during the interview with Sergeant Detective Keeler articulated that defense. Indeed, the statements were consistent with Anthony's trial testimony and rebut any suggestion that that testimony was recently contrived. See *Commonwealth* v. *Cutts*, 444 Mass. 821, 831 (2005) (no ineffective assistance where counsel did not seek to suppress statements that advanced defendant's theory of case).

Even if trial counsel's actions were not the result of reasonable tactical decisions, Anthony's claim would fail, because "[i]t is not ineffective assistance of counsel when trial counsel declines to file a motion with a minimal chance of success." *Commonwealth* v. *Howell*, 394 Mass. 654, 658 (1985), quoting *Commonwealth* v. *Conceicao*, 388 Mass. 255, 264 (1983). The motion to suppress Anthony's statements would have been unlikely to succeed; therefore, to have abandoned it could not have deprived Anthony of an "otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

Anthony argues that the statements should have been suppressed because he was in custody during the interview but was not given Miranda warnings. We disagree. To determine whether an interrogation was custodial for purposes of the Miranda warnings requirement, we must "examine all the circumstances surrounding the exchange between the government agent and the suspect, then determine from the perspective of a reasonable person in the suspect's shoes whether there was (1) a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest and (2) express questioning or its functional equivalent." *Commonwealth* v. *Morse*, 427 Mass. 117, 123 (1998),

quoting *United States* v. *Ventura*, 85 F.3d 708, 712 (1st Cir. 1996). In this case, any restraint on Anthony's freedom of movement was not of sufficient magnitude to render the interrogation custodial. The interrogation took place in a neutral location, a room in a court house.[43] Anthony voluntarily agreed to speak with the detectives. When a court officer knocked on the door of the room in which the interview was taking place and informed the detectives that the room was needed, Anthony's freedom of movement was not restricted while the detectives sought another room. After another room was located, Anthony again voluntarily agreed to speak with the detectives. Even after making incriminating statements, Anthony was allowed to leave the room to attend his son's arraignment. That he was not arrested until after the arraignment further supports the conclusion that he was not in custody during the interrogations. See *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984) (whether suspect is free to end interview may be evidenced by "whether the interview terminated with the defendant's arrest"). A motion to suppress based on the failure to administer Miranda warnings had little, if any, chance of success.

The same is true of the claim that counsel was ineffective for failing to request a hearing on the voluntariness of the statements. The test for voluntariness of a confession is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Souza*, 428 Mass. 478, 483-484 (1998), quoting *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1998). Factors to be considered include "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986).

We have examined the record, including both the detectives'

---

[43]Anthony was at the court house to watch his son's arraignment.

and Anthony's versions of the interviews, and are satisfied that
no issue of voluntariness exists. Anthony was a middle-aged
man and a Vietnam war veteran. The detectives made no prom-
ises of lenient treatment. While Anthony may have been con-
cerned for his son, he was calm and lucid during the interview.
Sergeant Detective Keeler's suggestion that relatives of the
victims might seek revenge, and that innocent people might be
endangered if Anthony delayed making a statement, did not
amount to coercion. There was no suggestion that the statement
was deceptive, cf. *Commonwealth* v. *Selby*, 420 Mass. 656, 664
(1995); in the circumstances, that concern was not unreason-
able. Sergeant Detective Keeler did not promise that he would
protect Anthony if he confessed, nor did he threaten to withhold
police protection if he refused to make a statement. Contrast
*Commonwealth* v. *Magee*, 423 Mass. 381, 388 (1996) (promise
to provide requested psychological treatment in exchange for
confession rendered statement involuntary). In addition, Anthony
was not a stranger to the criminal justice system.[44] Considering
all the circumstances, we conclude that Anthony's will was not
overborne. Therefore, counsel was not ineffective for failing to
raise the issue at trial.

As to the failure to challenge the photographic identification,
we see no ineffectiveness. Identification was not an issue at
trial. Since Anthony did not dispute that he was in the restaurant
or that he shot the victims, it is illogical to argue that trial coun-
sel was ineffective for failing to inquire into the validity of a
witness's identification of him as the shooter. See *Common-
wealth* v. *Nieves*, 429 Mass. 763, 771 (1999) (not ineffective as-
sistance for counsel not to request jury instruction inconsistent
with primary defense theory). For Anthony to argue simultane-
ously that he killed the victims in self-defense and that someone
else killed them could only have undermined his credibility
with the jury. His counsel, therefore, was not ineffective for
failing to challenge the identification.

10. *Claims raised by Damian.* We now consider the issues
raised by Damian. His first contention is that the judge errone-

---

[44]When Anthony testified at trial, he was impeached by several prior
convictions. See G. L. c. 231, § 21.

ously permitted Anthony's statements to Sergeant Detective Keeler, made on November 7, 1995, after Damian's arrest, to be used against Damian and that the prosecutor unfairly exploited that error. These statements described, inter alia, Damian as dealing drugs in the North End, and provided the only evidence that Damian was a drug dealer.

The judge did not err in allowing the statements to Sergeant Detective Keeler to be used against Damian.[45] While a limiting instruction that the statements were not admissible substantively against Damian would have been proper here, no such limiting instruction was requested at trial.[46] Accordingly, the judge could not surmise that Damian wished the evidence to be admitted against Anthony only. Indeed, the statements, if believed, were helpful to Damian, providing possible exoneration or at least a reduction of the charge from murder to manslaughter. Consequently, the judge could not safely assume that Damian failed to object by virtue of inadvertence rather than as the product of a conscious, and reasonable, strategy.

Damian maintains that there was an objection to the statements at issue.[47] He misrepresents the record. There was no objection on the ground that the statements were admissible against Anthony only; the basis for the objection was that the detective, a Commonwealth witness, could not testify to the conversation because the judge had ruled that the defense could not introduce the conversation. The judge overruled the objection on that ground, and properly so.[48]

Because there was no request for an instruction limiting the

---

[45]Because there was no error, there is no merit to the additional claim that the prosecutor exploited that error by referring in her closing to Damian as a drug dealer in the North End.

[46]Unless an admission is made during the course of a joint enterprise, an admission by one defendant cannot be used as substantive evidence against another defendant. See *Commonwealth* v. *Collado*, 426 Mass. 675, 681 (1998). Here, Damian was already under arrest when Sergeant Detective Keeler interviewed Anthony. Thus, the joint enterprise had ended, and a limiting instruction could have been requested.

[47]The objection was by counsel for Anthony, and counsel for Damian joined in the objection.

[48]Anthony's statement to Sergeant Detective Keeler was admissible as the statement of a party opponent. The statement could not be proffered by the defense. *Commonwealth* v. *Marshall*, 434 Mass. 358, 365 (2001).

statement so that it would not be admitted against Damian, Damian's counsel appears to be suggesting a claim of ineffective assistance of counsel. (For an explanation of the standard in this regard, see part 9, *supra*.) As discussed, the statements by Anthony were of value to Damian; any failure to object appears to have been the result of a strategic choice to support a claim of self-defense.

Damian's second claim of error relates to several jury instructions. We consider each.

a. *Joint venture.* Damian faults the judge's instruction on the intent element of a joint venture. A proper instruction on joint venture informs that the Commonwealth must prove beyond a reasonable doubt "(1) that the defendant was present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth* v. *Silanskas*, 433 Mass. 678, 689-690 (2001). Damian contends that the judge, in his initial and closing statements on the elements of joint venture, "submerged the shared mental state requirement" of the second element into the element of knowledge that another intends to commit a crime. Damian does acknowledge that the judge "at some point" stated separately the requirement of shared mental state.

There was no error. In his initial instructions on joint venture the judge stated:

> "In order to convict a defendant of joint venture, the Commonwealth must prove each of three essential elements beyond a reasonable doubt. First, it must prove that the defendant was present at the scene of the crime. Second, with knowledge that another intends to commit a crime or with intent to commit a crime. And third, by agreement was willing and available to help the other in carrying out the crime or crimes if necessary."

He then repeated that instruction. The instruction is the precise statement our cases require. See *id.* The judge later stated: "The Commonwealth must also prove beyond a reasonable doubt that the defendant shared the mental state or intent of the person or persons perpetrating the crime or crimes." He then provided

further guidance regarding the intent element, as quoted in the margin.[49]

The judge's statement at the end of the joint venture instruction, to which Damian objects, occurred in the following context:

> "In summary then, in order to convict a defendant of murder, armed assault with intent to murder, and assault and battery by means of a dangerous weapon, as joint venturers

---

[49] "In this case the defendants are each charged with four counts of murder in the first degree, armed assault with intent to murder, and assault and battery by means of a dangerous weapon, as set forth in their respective indictments. And [*sic*] must share an intent with the principal actor or actors to commit those crimes in order to be liable as joint venturers.

"You are permitted, but are not required, to infer the necessary mental state from a defendant's knowledge of the circumstances and subsequent participation in the offense or offenses. You may draw reasonable inferences from all of the facts and circumstances developed at trial. In doing so, you may rely upon your experience and common sense in determining a defendant's intent.

"Here, the defendants are charged with the crimes that I just mentioned on a joint venture theory. I shall discuss the intent required for the commission of each of these offenses shortly.

" . . .

"It must show more than mere presence at the scene, even when coupled with knowledge of the planned act. Mere acquiescence, passive acquiescence is not sufficient to warrant a conviction. There must be evidence of some actual, active participation in the crime or crimes. As I have said, the jury may infer the requisite mental state for a joint venture from the defendant's knowledge of the circumstances and subsequent participation in the offense or offenses.

" . . .

"In order to succeed with the joint venture theory, the prosecution must show that each defendant shared the mental state required for the crimes alleged in this case.

" . . .

"Specifically with respect to the crimes charged in this case on a joint venture theory, the Commonwealth must prove beyond a reasonable doubt in order to convict a defendant that he in some way assisted in the commission of the crimes alleged in this case while at the same time sharing with the principal actor the intent required for the commission of those crimes.

" . . .

"It is not necessary for the Commonwealth to show that joint venturers had an antecedent or prior agreement to encompass the commission of the substantive crime or crimes. To establish accomplice liability, that is liability in joint venture, it is enough that at the climactic moments the parties consciously acted together in carrying out the criminal endeavor, each thereby becoming responsible for the acts of the others."

or as a joint venturer, the Commonwealth must prove that a defendant was present at the scene of the attack on Robert C. Luisi, Sr., Antonio Sarro, Roman P. Luisi, Anthony Pelosi, Jr., and Richard Sarro, Jr., that he knew of the assailant or assailant's criminal intentions, and that by agreement he was willing and available to help the assailant or assailants, if necessary.

"For joint venture criminal liability, the defendant's knowledge requirement is satisfied by his knowledge that the crime will be committed by another person. The burden is on the Commonwealth to prove all three essential elements beyond a reasonable doubt before you may find a defendant guilty on a joint venture theory. If the Commonwealth fails to prove each of these three elements beyond a reasonable doubt, you must find a particular defendant not guilty on this joint venture theory."

This statement adequately set forth the Commonwealth's burden regarding intent because it required that the Commonwealth prove that Damian knew of the assailant or assailants' criminal intentions, and that by agreement he was willing and available to help the assailant or assailants, if necessary. The language quoted conveyed the intent required for a joint venture, particularly when considered with the lengthy references to intent previously provided. We consider the judge's instructions as a whole. *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). The essence of the joint venture requirement is that the defendant cannot merely be a bystander. He or she must share the mental state of the principal, and the instructions here on the subject of intent, considered as a whole, explained that concept to the jury.[50,51]

b. *Consciousness of guilt.* Damian argues that the judge instructed improperly on the issue of consciousness of guilt.

---

[50]Although Damian argues separately regarding the so-called *Acevedo* error, see *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998), and the instruction on defense of another, we have considered these matters in connection with Anthony's claims, see part 6, *supra.*

[51]Damian argues also that the judge responded improperly to a request made in a sidebar discussion at the conclusion of the charge. In response to a defense request that the judge instruct further that the Commonwealth must prove that the defendant shared the state of mind of the principal, the judge

Conceding that the content of the instruction given was "generally in accord" with the requirements of our case law, see *Commonwealth* v. *Toney*, 385 Mass. 575, 582-585 (1982), he complains that the judge improperly instructed that consciousness of guilt evidence could be used in determining whether Damian acted with malice. He contends that such instruction was improper because consciousness of guilt evidence, although relevant to the issue whether a homicide is unlawful, may not be used as evidence of malice. See *Commonwealth* v. *Lowe*, 391 Mass. 97, 108 n.6 (1984).

We have previously rejected the same argument. In *Commonwealth* v. *Cohen*, 412 Mass. 375, 392-393 (1992), we stated:

> "While evidence of consciousness of guilt is not ordinarily relevant to the issue of malice aforethought, . . . and while the judge did not explicitly preclude the jury from inferring malice aforethought from the evidence of the defendant's consciousness of guilt, we fail to see any error. The judge properly instructed the jury on consciousness of guilt, and the judge later properly instructed the jury on malice aforethought. Presuming that the jury followed the judge's instructions, we simply conclude that it was not logical for the jury to have inferred malice aforethought from the judge's instructions on consciousness of guilt. There was no error in the judge's instructions . . . ." (Citations omitted.)

Similarly here, the judge properly instructed on consciousness of guilt (as Damian concedes) and later properly instructed on malice aforethought. The instruction on malice aforethought occurred twenty transcript pages afer the instructions on consciousness of guilt, and it is not logical that the jury would have

stated that the law did not require such an instruction. The comment by the judge to counsel is of no import. As stated, the instruction he gave on the subject conveyed the correct concept to the jury.

Moreover, any suggestion that the judge misunderstood the law is dispelled by a later sidebar conference. During their deliberations, the jury requested, inter alia, a review of the law of joint venture. The judge reiterated his earlier charge on joint venture. When asked by defense counsel to emphasize the fact that the mental state of the perpetrator must be shared by the joint venturer, the judge stated, "I said that . . . . That's the law." Indeed, one of the attorneys conceded that the judge had mentioned "it."

inferred malice aforethought from the instructions on consciousness of guilt. There was no error.

11. *Review under G. L. c. 278, § 33E.* Pursuant to our responsibility under G. L. c. 278, § 33E, we have reviewed the entire record.

We have found some errors not raised by the defendants, but none creates a substantial likelihood of a miscarriage of justice. We mention them briefly. The prosecutor was permitted, over objection, to ask Anthony to comment on the credibility of other witnesses.[52] This was improper. See *Commonwealth* v. *Stuckich*, 450 Mass. 449, 459 (2008). In addition, the defendants were not present, as they should have been, when jurors were questioned concerning the newspaper article that was slipped under the door of the jury deliberating room. Despite the lack of an objection, it was nevertheless error to conduct the voir dire in the defendants' absence; the error, however, did not create a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Caldwell*, 45 Mass. App. Ct. 42, 45-46 (1998); Mass. R. Crim. P. 18 (a), 378 Mass. 887 (1979). Contrast *Commonwealth* v. *Robichaud*, 358 Mass. 300, 302-303 (1978).

Finally, in an instruction provided in response to a jury inquiry, the word "not" is omitted. The instruction stated as follows: "If the Commonwealth fails to prove each of these elements beyond a reasonable doubt, you must find the defendant guilty on a joint venture theory." The word "not" should have appeared before the word "guilty." While this appears to have resulted from a stenographic error, see *Commonwealth* v. *Guy*, 24 Mass. App. Ct. 783, 788 (1987), we cannot dismiss the possibility that the judge misspoke. Even in this event, a review of the over-all instructions satisfies us that the jury understood its function, and there was certainly no substantial likelihood of a miscarriage of justice. We perceive no reason to exercise our extraordinary powers to reduce the verdict or order a new trial.[53]

*Judgments affirmed.*

*Orders denying motions for a new trial affirmed.*

---

[52]The prosecutor asked Anthony twice if other witnesses had lied in their testimony.

[53]In the course of our review of the record pursuant to G. L. c. 278, § 33E,

we have observed that the judge's instruction on assault with intent to kill was not a model of clarity. There was no objection, and no issue is raised on appeal regarding this instruction. We conclude that there is no substantial risk of a miscarriage of justice from the instruction. The judge conveyed to the jury the main points that assault with intent to kill is a lesser included offense of assault with intent to murder and that the lesser offense could be found if the jury found mitigating circumstances. The mitigating circumstances were defined, albeit at an earlier time in the instructions. The judge adequately captured all the elements of the offense.